**EATON CORPORATION, INDUSTRIAL TRUCK DIVISION**

v.

**The UNITED STATES.**

No. 452–76.

United States Court of Claims.

Jan. 24, 1979.

Before COWEN, Senior Judge, and DA-VIS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's request, filed May 26, 1978, for review by the court of the recommended decision of Trial Judge George Willi, filed May 2, 1978, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE *

WILLI, *Trial Judge:* By this suit plaintiff [1] challenges the correctness, subject to the finality standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), of a decision [2] by the Armed Services Board of Contract Appeals (the Board) holding that plaintiff had breached the same price warranty provision of two consecutive requirements contracts for lift truck replacement parts.

Except for two instances to be identified, the facts that follow were not in dispute before the Board.[3]

Richard A. Dean, Cleveland, Ohio, for plaintiff; Lance B. Johnson, Cleveland, Ohio, attorney of record; Arter & Hadden and John P. Palumbo, Cleveland, Ohio, of counsel.

Alan L. Ferber, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Thomas W. Petersen, Washington, D. C., of counsel.

---

* The opinion and recommended conclusion of law are submitted pursuant to Rule 166(c). The necessary facts are stated in the opinion.

1. As used herein, the term "plaintiff" is intended to denote both the Eaton Corporation and its nominal predecessor Eaton, Yale & Towne, Inc.

2. *Eaton Corporation*, ASBCA Nos. 17713 and 18378, 74–2 BCA ¶ 10,697. The Board made its damage award in a subsequent proceeding. *Eaton Corporation*, ASBCA No. 19886, 76–1 BCA ¶ 11,633. Plaintiff confines its challenge in the present proceeding to the liability issue

of breach, apparently being content with the Board's measure of damages if its perception of liability were found to be correct.

3. Examination of the transcript of the hearing before the Board discloses that the presiding member correctly assigned the burden of proof in the proceeding to the Government as the proponent of a downward adjustment in contract price. *Victory Constr. Co. v. United States*, 510 F.2d 1379, 1385, 206 Ct.Cl. 274, 285 (1975).

Historically, the Government obtained its replacement parts for plaintiff's equipment by advertising for bids on specific quantities of designated parts. Invariably, plaintiff proved to be the only bidder.

In 1966 the Government surveyed its past annual purchases under the above procedures and determined that the volume involved was sufficient to justify procurement by a single requirements contract, thereby eliminating the necessity for resort to a succession of individual contracts of a largely repetitive nature.

To initiate its new approach to parts procurement, the Defense Construction Supply Center (DCSC) directed a Request for Quotations (RFQ) to the plaintiff on June 24, 1966. That document consisted essentially of the framework of the requirements contract that DCSC proposed to let, interspersed with appropriately placed blanks for plaintiff's insertion of its quotations. It also included certain supplementary questions to be answered by plaintiff in amplification of the quotations that it advanced. Those portions of the RFQ relating to price will be later detailed.

Plaintiff did not respond to the RFQ until January 26, 1967, following a telephone inquiry by a DCSC contract negotiator, Mr. Raabe, to plaintiff's Government Service Order Administrator, Mr. Fiorentino. In a letter of that date Mr. Fiorentino stated that he was transmitting two copies of plaintiff's "current price list, form 4309," adding that if DCSC found those prices acceptable, subject to appropriate adjustment for delivery and special packaging charges, plaintiff would then execute and return the RFQ.

Before the Board there was a dispute as to the content of the price lists that Mr. Fiorentino forwarded to DCSC. Both Mr. Fiorentino and Mr. Raabe testified, the former asserting that the material included a cover sheet that identified the scheduled prices as suggested dealer resale prices and the latter denying that any cover sheets were received. In the absence of contradictory proof apart from Mr. Fiorentino's testimony, the Board chose to believe Mr. Raabe's version of the facts. On that state of the record, the Board's finding cannot be said to lack the support of substantial evidence. It must, therefore, be accorded finality in the present proceeding.

It is not disputed that the cover sheet was the only part of price list 4309 that identified the prices appearing thereon as suggested dealer resale prices.

On February 24, 1967, plaintiff returned the RFQ, signed by its controller, to DCSC. Set forth below are the portions of it relevant to the question of price.

Article I of the Special Terms and Conditions proposed for inclusion in the contract provided as follows: [4]

## SCOPE OF CONTRACT

A. This is a Requirements Contract covering repair parts and/or components for equipment specially designed and manufactured by or for—EATON, YALE & TOWNE, INC. 1100 ROOSEVELT BLVD., PHILADELPHIA, 15, PA. in support of Materials Handling Equipment as set forth in parts price list 4309 dated June, 1966 which has already been mailed to the attention of Mr. J. K. Raabe

(Offeror to insert title, number and date of price list or lists.) and any future supplements, revisions or changes thereto which may be issued as provided for in Article VI, "Revision of Prices".

Plaintiff completed Article V of the proposed Special Terms and Conditions as indicated by the underscoring shown in the following quotation of the article:

## PRICES

A. This contract is based on the supplies and * net prices contained in the contrac-

* If more than one method of pricing is contained in price list, state pricing structure applicable to this contract. i. e.—net, list, distributor, fleet, etc.

tor's parts price list specified in Article I, entitled, "Scope of Contract". The con-

4. The information inserted by plaintiff is identified by underscoring.

tractor upon execution of the contract will furnish to the Contracting Officer, Defense Construction Supply Center, Directorate of Procurement and Production, Columbus, Ohio 43215, ATTN: DP/KS, a minimum of twenty (20) copies of such price list, without charge, individually bound. Contractor will furnish additional copies as required.

B. The terms and conditions of this contract shall control in the event of conflict with the Contractor's Price List.

C. *Discounts*—The _net_ prices set forth in the Contractor's Price List are subject to the following discounts

TIME—_30 Days_ TRADE—_Net_

Article VII, for inclusion in the proposed contract, provided as follows:

## PRICE WARRANTY

The contractor warrants that the prices to be paid by the Government for any item during the term of this contract are as low as those charged by the contractor to any commercial or nongovernmental customer or any other Government agency purchasing the same item in like or smaller quantities.

Among the collateral certifications included in the RFQ was the following:[5]

### STATEMENT AS TO ESTABLISHED CATALOG PRICES

*Definitions*—The following definitions pertain to this statement of established catalog prices:

(i) The term (Commercial Item) includes both supplies and services of a class or kind which (1) is regularly used for other than Government purposes, and (2) is sold or traded in the course of conducting normal business operations.

(ii) An item sold to affiliates of the seller for end item use for the Government only is not considered as an item sold (to the general public).

1. Quoter represents that prices are included in a catalog, price list schedule, or other form that—

a. Is regularly maintained by the manufacturer or vendor.

Yes (x) No ( )

b. Is either published or otherwise available for inspection by customers.

Yes (x) No ( )

( ) Check this block if your submitted parts price list was specially prepared for use by the Government and the prices shown therein, including applicable discounts, are no higher than those published in your commercial listing(s). If this block is checked, the contractor shall also submit a copy of his commercial listing(s) and enter an affirmative reply for this paragraph 1b.

c. States prices at which sales are currently, or were last made to a significant number of buyers constituting the general public.

Yes (x) No ( )

2. Established price list generally pertains to commercial items.

Yes (x) No ( )

3. If answer to 1c or 2 above is negative, quoter warrants that the manufacturer(s) or vendor(s) method of establishing selling price, including profit rates on noncommercial items is comparable to those applicable to his commercial items.

Yes ( ) No ( )

4. Affirmative replies to paragraphs 1a, 1b, 1c and 2 combined, or affirmative replies to paragraphs 1a, 1b and 3 combined qualifies the contractor as having established catalog prices.

\* \* \* \* \* \*

Note that 18 U.S.C. § 1001 prescribes criminal penalties for making false representations to the Government.

---

**5.** The "x" marks appearing in the quoted material were inserted by plaintiff to signify its answers to the questions put to it.

In the context of the present controversy, the important pricing terms and understandings to which plaintiff committed itself by submitting the RFQ in the form that it did can be summarized as follows: (1) Plaintiff offered to supply the parts specified in its price list 4309, dated June 1966, at the base prices quoted therein without discount for prompt payment or otherwise; (2) Plaintiff represented that the articles included in the list were sold in the normal course of its business operations; (3) Plaintiff represented that list 4309 was regularly maintained and published by it for inspection by its *customers* and that the prices set forth in it were those at which it made sales to a significant number of buyers constituting the general public (as opposed to the Government); and (4) Plaintiff warranted that the prices that it proposed to charge DCSC were as low as those charged any commercial or non-governmental customer.

On September 12, 1967, the parties consummated Contract No. DSA–700–67–D–0046, a 1-year requirements contract incorporating the terms of the RFQ, as detailed above. The contract, effective October 1, 1967, was renewable annually at the Government's option to a maximum term of 3 years. The Government exercised that option and the parties operated under the terms of the contract until it was superseded in May 1970 by a successor requirements contract containing similar terms.

The successor contract, No. DSA–700–70–D–0061, was also initiated by DCSC's issuance of an RFQ to the plaintiff. This was done on May 26, 1969, and plaintiff returned it in executed form on June 27, 1969. Insofar as pertinent here, the RFQ contained all of the provisions that were in the one that led to the original contract and, in addition, an expanded version of the required STATEMENT AS TO ESTABLISHED CATALOG PRICES, as earlier set forth herein. The addition was as follows:

9. The following data will be treated as confidential by the Government. Quoter must furnish information requested below:

a. Check applicable type of commercial price lists.
(1) Manufacturer's _____
(2) Dealers _____
(3) Distributors _____
(4) Wholesale _____
(5) Retail _____
(6) Other _____

b. Discounts: Show trade discount percentage-wise from above price list offered customers as set forth below:

| | Lowest *Discount* | Highest *Discount* |
|---|---|---|
| (1) Federal Government (current offer) | _____ | _____ |
| (2) Federal Government (previous offer) (if any) | _____ | _____ |
| (3) Distributors Wholesalers and Dealers | _____ | _____ |
| (4) Other Manufacturers | _____ | _____ |
| (5) Customers receiving higher discounts other than stated under 1 thru 4. | _____ | _____ |

c. Delivery Terms: F.O.B. Origin F.O.B. Destination

d. Time Discount: _____

e. Are the discounts offered to sellers in b(3) above conditioned on maintaining specified minimum stock and/or other conditions ( ) Yes ( ) No. If yes, what are established minimums and other conditions?

Leaving the above portion completely unanswered, plaintiff entered the same information on this RFQ as it had on the first one. Again, its price quotations were as contained in the current edition of price list 4309. This time, however, DCSC received the identifying cover sheet as a part of plaintiff's price list submission. Upon examining the RFQ, as proffered by plaintiff, DCSC's contract negotiator was unable to reconcile a quotation of dealer resale prices with plaintiff's affirmative statement elsewhere in the RFQ to the effect that no discount from those prices would be granted. In addition, plaintiff's failure to respond to the price list inquiries set forth in the quotation immediately above increased the negotiator's skepticism. She therefore telephoned Mr. Fiorentino to obtain an explanation and to ascertain specifically whether it was actually plaintiff's intention to deny the Government a discount from

the suggested dealer resale prices that it had quoted. The negotiator testified that Mr. Fiorentino informed her that plaintiff did allow "stocking dealers" a discount from suggested resale price to cover transportation, handling and inventory costs, adding that he did not know the precise amount of the discount but would check into the matter and advise her accordingly. The DCSC negotiator testified that after several months passed with no word from Mr. Fiorentino, she telephoned him again and was advised that he had been mistaken in his impression that dealers were allowed discounts from the 4309 list prices. He assured her that those were the net prices to everyone. The Board found that the negotiator accepted that assurance and on the strength of it recommended award of a successor contract to the plaintiff, with terms to be as set forth in the RFQ. The DCSC negotiator's testimony, corroborated by plaintiff's affirmative representations in the RFQ (as well as by its failure to provide answers to direct questions in the RFQ that would have fully disclosed its commercial pricing practices) and contradicted only by that of Mr. Fiorentino, fully qualifies as substantial evidence amply sufficient to support the Board findings that were based on it.

In 1971 the DCSC contracting officer for plaintiff's follow-on contract then in force learned from a Federal Supply Schedule published by the General Services Administration that one of plaintiff's franchised dealers was offering to sell the Government replacement parts at 2 percent less than the prices that plaintiff was charging DCSC. Pointing to the price warranty clause in the requirements contract, the contracting officer wrote plaintiff proposing a 2 percent price discount on all orders placed after April 1, 1971. Plaintiff refused, contending that since dealers were not end-users the prices charged them were not relevant comparatives within the meaning of the warranty clause. In July 1972, the contracting officer rendered a final decision finding plaintiff in breach of the price warranty clause and demanding payment of a 2 percent rebate on all orders placed with it

after April 1, 1971. Shortly thereafter DCSC learned that, in fact, plaintiff's uniform practice had been to sell to its dealers at a discount of 25 percent from the suggested resale prices set forth in the list 4309 that was the pricing basis for both requirements contracts. In the face of that information the contracting officer under the original contract issued a final decision to the effect that the price warranty clause required plaintiff to extend DCSC the same discount that it applied to its dealers.

On plaintiff's appeal, the Board upheld both contracting officers' decisions.

Plaintiff's central contention in its current effort to upset the Board's determination is that its franchised dealers are not "customers" within the meaning of the price warranty clause because under normal trade parlance and usage a customer is an end-user and not, like a dealer, one who is obliged to perform service functions in relation to products that he buys for eventual resale to an end-user. Whatever the merit of this contention, viewed in the abstract, it is completely incompatible with the undisputed facts of this case.

Under direct examination by plaintiff's attorney, its pricing manager, Mr. Thomas, gave the following account of the independent status of the franchised dealers and their relative prominence in its sale of replacement parts:

Q. Can you break down, again in rough percentages, the percent of parts sold to dealers as opposed to all other purchasers?

A. 95 percent would be sold to dealers.

Q. Of all parts sales?

A. Yes.

Q. This may be a little out of your area, but from what you know could you briefly describe the dealer system and how it works?

A. The dealer system, briefly from my experience, is a company sales oriented to sell industrial trucks.

It is a franchise system independently owned by them. They set their own sala-

ry figures, quotations, and in general carry on as independent businessmen.

In our case it is designed primarily for the sale of Industrial Trucks and it is supporting activity such as used equipment and rental of equipment.

Q. Is the relationship merely one of seller and purchaser or is it more extensive than that?

A. I would say it is seller and purchaser.

To suggest, as plaintiff does, that the independent purchasers to whom it sells no less than 95 percent of its replacement parts are not its "customers" for those parts simply defies commercial reality. Moreover, in its dealings with DCSC plaintiff itself characterized those dealers as its customers when it responded to the questionnaire portion of the RFQs directed to its dealer resale price list by representing that list 4309 is regularly maintained and published by it for inspection by its "customers."

Though, as previously indicated (note 2, *supra*), plaintiff is not challenging the Board's subsequent decision on damages, it is worth noting that it was not required to extend DCSC the 25 percent discount that it regularly allowed dealers on routine purchases of parts for replenishment of their inventories. Instead, a discount of 15 percent was approved, that being the same discount allowed dealers on special purchases of parts that they would not be required to inventory because they had immediate sale for them. In the circumstances of this case that overall result is eminently just and proper.

## CONCLUSION

For the reasons given, plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment granted, and the petition dismissed.