**VICTORY CONSTRUCTION CO., INC., and Paul Krummel (a joint venture)**

v.

**The UNITED STATES.**

No. 8–73.

United States Court of Claims.

Feb. 19, 1975.

Richard W. Miller, Kansas City, Mo., for plaintiff. George T. O'Laughlin, Kansas City, Mo., attorney of record. William E. Simmons, Windsor, Mo., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DURFEE, Senior Judge, and SKELTON and KASHIWA, Judges.

PER CURIAM:

This case comes before the court on defendant's request, filed June 12, 1974, for review by the court of the recommended decision filed April 12, 1974, by Trial Judge George Willi pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment. Upon consideration thereof, together with the opposition thereto, and the briefs and oral argument of counsel, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, defendant's request for review and motion for summary judgment are denied, plaintiff's motion for summary judgment is granted and judgment is entered for plaintiff in the sum of $81,784.23.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge:

On August 6, 1965 the Army Corps of Engineers awarded plaintiff, two general contractors associated in a joint venture, a $465,395.80 contract for modification of certain existing flood control structures along the west bank of the Mississippi River at St. Louis, Missouri. The job included the refurbishing and alteration of storm sewers comprising a part of the control complex. That work, for which the contract provided by reference to estimated quantities of individual items, each with its own unit price, was performed by a subcontractor, Western Waterproofing Co., Inc. In the course of performance the Government ordered increases in the estimated quantities of five categories of the subcontract work. Western did its job so diligently and efficiently that in thirty days it not only completed the work for which the contract allotted 270 days' performance time, but finished all of the Government-ordered increases as well.

The present suit is brought on behalf of Western Waterproofing to reverse a

decision of the Corps of Engineers Board of Contract Appeals (the Board) upholding the contracting officer's determination as to the amount of compensation due Western for the additional work that it performed at the Government's behest. 69–2 BCA ¶ 7920.

The issue presented by the parties' cross-motions for summary judgment is the extent to which that decision merits the finality accorded by the interaction of the standard Disputes clause of the contract and the applicable criteria of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322 (1970).

In addition to a conventional Changes article, the subject contract included among its Special Provisions a clause required by the Armed Services Procurement Regulations[1] in all " * * * contracts containing estimated quantity items when the Contracting Officer has reserved the right to vary the estimated quantity during the performance of the work to accommodate actual conditions encountered" as follows:

SP–6. *VARIATIONS IN ESTIMATED QUANTITIES (JAN. 1965).*— Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than fifteen (15%) percent above or below the estimated quantity stated in this contract,

as it may hereafter be modified, an equitable adjustment in the contract unit price shall be made upon demand of either party. If the quantity variation is such as to cause an increase in the time necessary for completion, the Contracting Officer shall, upon receipt of a written request for an extension of time within ten (10) days from the beginning of such delay, or within such further period of time which may be granted by the Contracting Officer prior to the date of final settlement of the contract, ascertain the facts and make such adjustment for extending the completion date as in his judgment the findings justify. If the parties fail to agree upon an equitable adjustment in the contract price or time the dispute shall be determined as provided in the clause of this contract entitled "Disputes."

The quantity overrun that invoked the procedure defined by paragraph 6 of the Special Provisions occurred with respect to the five items of sewer alteration work identified below by contract Item Number, Estimated Quantity, Actual Quantity, Excess (in units) of Actual Quantity over 115 percent of Estimated Quantity, Unit Price Estimated by the Government Prior to Bidding, Unit Price per Award, and Unit Price Allowed by the Contracting Officer for Equitable Adjustment purposes.

| Item No. | Est. Quan. | Unit | Actual Quan. | Quantity Above 115% of Estimate | Govt. Est. Unit Price | Unit Price Per Award | Unit Price on Excess Per Equit. Adj. |
|---|---|---|---|---|---|---|---|
| 17 | 9 | ea. | 11 | .65 ea. | $101.45 | $1,085.70 | $324.30 |
| 18 | 300 | lin. ft. | 394.71 | 49.71 lin. ft. | $66.30 | $92.40 | $27.62 |
| 19 | 15 | sack | 94.70 | 77.44 sacks | $269.30 | $856.90 | $256.15 |
| 20 | 90 | sack | 116.83 | 13.33 sacks | $327.35 | $561.85 | $167.94 |
| 21 | 15 | sack | 62.37 | 45.12 sacks | $579.50 | $856.90 | $256.07 |

On April 15, 1966, after Western's sewer work had been completed and the precise extent of additional work became known, the contracting officer wrote the plaintiff a letter detailing the overrun items and quantities and making the following statements with respect to them:

Examination of your unit prices for the above-listed items reveals these prices are in excess of amounts considered equitable for the work. Therefore, in accordance with the provisions of paragraph SP–6 of the contract specifications, you are hereby notified

---

1. 32 C.F.R. § 7.603–27 (1967).

that equitable downward adjustments in unit prices for the excess quantity of these items are deemed warranted.

It is requested that you furnish a proposal reflecting such reductions. Said reductions shall apply only to the quantity in excess of 115 percent of the estimated contract quantity of each respective item. Your proposal shall be broken down into labor, plant and material costs and should be in sufficient detail to permit prompt evaluation.

\* \* \* \* \* \*

In determining the adjusted unit price for each of the items involved in the overrun, the contracting officer adhered to the approach indicated by his opening observations and directives. He evidently conceived the quantity variance clause, in an overrun situation, as not only entitling the Government to insist on an equitable adjustment of contract price for units in excess of 115 percent of those specified in the contract but also as limiting the price payable on such excess units to that which the contractor could affirmatively justify on the basis of his actual cost experience in performing the basic contract requirements for the same items. In short, he placed on the contractor the burden of proving the price to which it was entitled for the overrun units. In net effect, he treated the excess portion of the work as though it had been performed under a retroactive type of fixed-price redeterminable contract. 32 C.F.R. §§ 3.404–1, 3.404–6 (1969).

Although Western Waterproofing insisted to the contracting officer that a proper interpretation of the applicable ASPR provision expressly prohibited a reduction of contract unit price in the circumstances presented and further contended that the contract unit prices, as applied to the overrun quantities, were equitable in any event,[2] it nonetheless complied punctually with his demand for its cost records. By a letter of August 7,

1967 the contracting officer informed the plaintiff that he rejected Western's arguments in support of its request for payment at contract unit prices on the overrun quantities. He added:

I will now proceed to prepare a reasonable cost estimate based on actual Corps of Engineers field records and other information available covering the entire operation, including overhead, but exclusive of mobilization and demobilization. This total cost will be prorated among the overrun items to determine an estimated actual cost per unit of each item. This estimated actual cost per unit plus an equitable profit factor will thus become the new unit price for the quantities in excess of 115 percent of the estimated contract quantities.

\* \* \* \* \* \*

It was the above method that the contracting officer employed to arrive at the equitable adjustment that is the subject of the present suit.

Since separate records had not been maintained on the work in excess of 115 percent of contract quantities, it was impossible to determine the actual cost of performing that excess, either in the aggregate or for any of the individual categories of work involved. The records were adequate, however, to enable the parties to agree on the total direct cost of performing the entire portion of the contract work represented by the five items on which overruns were experienced. To that base figure the contracting officer added allowances for overhead and profit, for both Western and its prime, the plaintiff, and thereby arrived at a total aggregate price for the five items in their entirety. He then, and still over objection, apportioned the total price figure among the five types of work in accordance with the proportion that the Government's prebid estimate of unit price for each bore to their sum. Finally, he developed a unit price

2. The Board record discloses, however, that at one time Western Waterproofing offered to accept a 15 percent discount of contract unit price on the excess units in order to terminate the entire controversy. The contracting officer rejected that compromise proposal.

within each category by simply dividing the total number of units involved into the aggregate price apportioned to the category. Without conceding the overall propriety of this procedure, Western protested that the apportionment of lump-sum price among the five categories of work should at least be based on actual contract unit prices rather than on a pre-bid estimate that had proved to be drastically wide of the mark. The contracting officer agreed to that revision and on August 8, 1968 unilaterally issued a change order allowing $35,328.63 as compensation for the units of work performed in excess of 115 percent of the quantities specified by the contract. Had that excess been compensated at contract unit prices, plaintiff would have received $117,112.86—$81,784.23 more than allowed by the contracting officer. It is that differential for which the present suit is brought.

In resisting the contracting officer's demands for a downward revision of contract price for the excess work, plaintiff's primary reliance was on its interpretation of the ASPR provision that had superseded the one in force at the time that the subject contract was entered into—32 C.F.R. § 7.603.27 (1967), previously reproduced herein.

In 1968 the Regulations [3] were amended to require inclusion of the following clause "in [all] contracts containing estimated quantity items":

### VARIATIONS IN ESTIMATED QUANTITIES
### (APRIL 1968)

Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than fifteen percent (15%) above or below the estimated quantity stated in this contract, an equitable adjustment in the contract price shall be made upon demand of either party. *The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation* above one hundred fifteen percent (115%) or below eighty-five percent (85%) of the estimated quantity. *If the quantity variation is such as to cause an increase in the time necessary for completion, the Contracting Officer shall, upon receipt of a written request for an extension of time within ten (10) days from the beginning of such delay, or within such further period of time which may be granted by the Contracting Officer prior to the date of final settlement of the contract ascertain the facts and make such adjustment for extending the completion date as in his judgment the findings justify.* [Emphasis added.]

Plaintiff contended that in unambiguous terms the above provision specifically limited an equitable adjustment reducing the contract price on excess units to cost economies realized by the contractor solely on account of the volume increase represented by the additional quantities involved. In its situation, the plaintiff urged, there had been no realization of unit cost economies by reason of the increased volume of work.

By a letter of June 6, 1968 the contracting officer formally rejected the contention of plaintiff's attorney, Mr. Miller, outlined above. In pertinent part, the letter stated:

Reference is made to our meeting on 29 May 1968 concerning price adjustment for the overrun quantities in excess of 115% of contract items 17 through 21 under subject contract.

As agreed at the conclusion of said meeting, I have explored * * * Mr. Richard W. Miller's interpretation of the recently revised wording of the clause entitled "Variations In Estimated Quantities" which appears in Revision No. 27 of the Armed Services Procurement Regulation, 15 April 1968. * * *

* * * * * *

The cover sheet of the ASPR Revision No. 27 clearly explains that the

---

3. 32 C.F.R. § 7.603–27 (1969).

revised wording is merely to make more explicit that only the quantities which exceed 115% or less than 85%, of the estimated quantities are subject to adjustment under the clause. *The revised wording adds no more to the intent of the clause than was always there.* Accordingly, I cannot agree with Mr. Miller's interpretation. [Emphasis added.]

I have determined that $431.98 can be added to the allowable overhead as representing the interest heretofore excluded from overhead pool. This will raise the settlement figure to $35,308.22. A contract modification will be prepared as soon as practicable to provide for this amount and will be submitted to you for acceptance.

Two things are apparent from the foregoing. First, that in the view of the contracting officer the 1968 ASPR revision of the earlier provision, because of which the quantity variance clause was included in the subject contract, was intended to clarify, not to alter the meaning of the provision in force when the contract was entered into. Second, he felt that, as clarified, the ASPR provision authorized an approach to the pricing of overrun quantities by reference not to a demonstrated differential between the cost of performing the overrun work and the estimated quantities of the same type work, but to an average cost of the entire work.

On October 29, 1968 the contracting officer issued his final decision rejecting plaintiff's exceptions to the equitable adjustment effected by his unilateral change order of the prior August 8.

Plaintiff timely appealed this decision and elected to proceed before the Board by way of a conference-type hearing in respect to which the evidentiary record was augmented solely by the addition, with the Government's affirmative acquiescence, of an affidavit by the vice president of Western Waterproofing who participated in the preparation of its bid to the plaintiff. 69–2 BCA at 36,836. While reversal of the Board's affirmance

of the contracting officer is required on broader and more fundamental grounds, it should be noted that its treatment of the affidavit was seemingly incongruous in any case.

The affiant flatly declared that in assessing the work requirements for the job he concluded that there would be a quantity overrun in those items on which overruns actually occurred; that the extent of the actual overruns did not exceed that anticipated by him; and that the projected costs and unit prices bid by Western were predicated on the gross volume of work anticipated by him, *viz.,* the contract quantities plus the anticipated overruns.

Though the Board received the affidavit into a record that by its account of the facts included no countervailing evidence whatever on the matters recited, it denied it evidentiary status by simply characterizing it as an unsupported allegation rather than admissible and probative proof. Thus, in the course of approving the adequacy of the contracting officer's equitable adjustment the Board observed (69–2 BCA at 36,836):

> * * * the Government's right to demand an equitable adjustment could [not] be defeated by the subcontractor's *allegation* that its prices to the prime were predicated on factors or quantities different from those contained in the contract. However, *such an allegation, if proven,* might affect the amount of the equitable adjustment determined in response to either party's demand. [Emphasis added.]

In the circumstances of this case the affidavit was certainly not just an unsupported averment offered in the nature of an amended pleading. It was proffered and apparently received as evidence, relevant by the Board's own acknowledgment, that at least tended to prove[4] the proposition that the Board expressly conceded "might affect the amount of the equitable adjustment". There is not the slightest indication that the Board discounted the affidavit either

4. Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967).

because it found its factual purport to be inherently unbelievable or because it deemed that probative purport overcome by countervailing proof elsewhere in the record. The Government's effort on brief to invoke the latter thesis to justify the Board's action is totally unsupported by the Board's own words.

Of far more basic concern, however, is the fact that the Board shared the contracting officer's mistaken understanding of the effect of the variance clause when an overrun occurred. Thus, after observing that: "As written, the clause appears to contemplate a complete repricing of those contract items which vary from the estimated quantities by more than 15%",[5] the Board proceeded to evaluate the contracting officer's price determination from the standpoint of whether the contractor had shown an incurrence of costs greater than those reflected in the determination. Satisfied that such a showing had not been made, the Board approved the determination and further observed, in conclusion (69–2 BCA at 36,837):

> We have also analyzed the basis on which the Contracting Officer has determined the amount of the equitable adjustment and find the over-all adjustment, both in time[6] and money, constitutes an equitable adjustment which places the contractor in as favorable position as he would have been, absent any overruns in the item quantities.

■ First, there is the incidence of the burden of persuasion. Both the contracting officer and the Board clearly imposed on the contractor the burden of affirmatively establishing the price to which it was entitled on the overrun quantities. Quite apart from questions

going to the essentials of the pricing standard imposed by the relevant ASPR provision,[7] it is clear in any event that as the proponent of the equitable adjustment, it was the Government, not the contractor, on whom devolved the burden of proving the extent of any downward departure from the unit prices established by the contract for the items comprising the excess work. Nager Electric Co. v. United States, 442 F.2d 936, 946, 194 Ct.Cl. 835, 853 (1971). The Board erred if, as its decision seems to indicate, it agreed with the contracting officer that it was up to the contractor to affirmatively justify the amount that it sought rather than up to the Government to prove why the amount paid should be less than that called for by the contract's unit prices.

Second, and more important, is the related question of the precise nature of the price readjustment standard on which the burden of proof is to operate in order to produce a proper end-result in the particular circumstances presented by this case.

As earlier noted, the contracting officer read the subject contract's quantity variance clause as calling for the repricing of excess quantities on the basis of the contractor's average actual cost of providing the entire quantities (both base and excess) of each of the items involved in the excess, plus an allowance for a "reasonable" profit thereon. It will be recalled that in rejecting the contractor's contention that the variance clause, as illuminated by the 1968 ASPR provision supplementing that in force at the inception of the contract, only authorized a deviation from contract unit prices to reflect differences in performance cost attributable to volume differential, the contracting officer stated that an examination of the history attending

---

5. 69–2 BCA at 38,836.

6. The 12-day enlargement of performance time is inconsequential since, as previously noted, Western completed the entire job in one-ninth of the time originally allotted.

7. G. L. Christian & Associates v. United States, 312 F.2d 418, 424, 160 Ct.Cl. 1, 11–12,

cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); Winston Bros. Co. v. United States, 458 F.2d 49, 52, 198 Ct.Cl. 37, 44 (1972). Moreover, in the instant case both parties freely concede the governance of the ASPR provision in the application and interpretation of the quantity variance clause.

promulgation of the 1968 ASPR supplement had convinced him that: "The revised wording adds no more to the intent of the clause than was always there." The Board apparently agreed with the contracting officer's construction, for it stated (69–2 BCA at 36,836–37):

As written, the clause appears to contemplate a complete repricing of those contract items which vary from the estimated quantities by more than 15%. A review of the history of the clause and its subsequent revision by ASPR Revision 27, dated 15 April 1968, *clarifies* the intent. * * * [Emphasis added.]

■ Neither party in the present proceeding has shed any further, much less different light on the intended meaning of the ASPR provision, as supplemented, and independent research has failed to unearth any indication contrary to the construction placed on it by the contracting officer and the Board. Presumably the "history" referenced by the Board is that earlier noted by the contracting officer. Accordingly, for purposes of this decision, the language of the 1968 revision is accepted as a clarification of the meaning intended by the predecessor provision in force when the subject contract, with its quantity variance clause, was entered into. Viewing the 1968 ASPR provision as a clarification rather than a change, its subsequent effective date detracts not at all from its relevance to an interpretation of the antecedent clause in the subject contract. *Cf.* Bethlehem Steel Corp. v. United States, 423 F.2d 300, 191 Ct.Cl. 141 (1970); Hills Transportation Co. v. United States, 492 F.2d 1394, 204 Ct.Cl. 51 (1974).

■ In unqualified terms, the 1968 clarifying ASPR provision, *supra,* declares that "The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above one hundred fifteen percent (115%) or below eighty-five percent (85%) of the estimated quantity." It is difficult to imagine definitive language that would more clearly convey an absolute limitation on the metes and bounds of inquiry in the determination of a departure from contract unit prices in the pricing of work outside the parameters of permissible variance. The language is fully as explicit in specifying the basis for any recasting of prices as it is in mathematically defining the volumetric prerequisite to any adjustment at all. Distinctly, the proponent of an adjustment is told that it will be confined in amount to such cost differentials as are directly attributable to a volume deviation greater than 15 percent from stated contract quantities. Applied in relevant context, an Armed Services Procurement Regulation has statutory status. G. L. Christian & Associates v. United States, 312 F.2d 418, 160 Ct.Cl. 1, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); Winston Bros. Co. v. United States, 458 F.2d 49, 198 Ct.Cl. 37 (1972). It is consequently appropriate, in the absence of exceptional circumstances not present here, to accord the language of such a regulation, just as a statute, its ordinary, everyday meaning. Malat v. Riddell, 383 U.S. 569, 571–72, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). *See also* Hotpoint Co. v. United States, 117 F.Supp. 572, 574, 127 Ct.Cl. 402, 406, cert. denied, 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 647 (1954). When this is done it is simply not reasonably possible to conclude, as did the Board, that the implementary quantity variance clause of the subject contract " * * * contemplate[s] a complete repricing of those contract items which vary from the estimated quantities by more than 15%." Where, as here, the contract language (construed in harmony with the seminal ASPR) undertakes to specify the mode of adjustment, its command must be followed. Rice v. United States, 428 F.2d 1311, 1314, 192 Ct.Cl. 903, 908–09 (1970).

On brief the Government attempts to justify the expansive construction embraced by the contracting officer and the Board as necessary to the discourage-

ment of so-called "unbalanced bids" by contractors. Such a bid, it is explained, is one in which the contractor allocates a disproportionate share of indirect costs and anticipated profit to the unit prices bid for those items on which he anticipates an overrun; the object being to reap overgenerous profits should the anticipated overruns materialize. While in the abstract this suggestion has considerable logical appeal, the difficulty with its application to the present controversy is that, in addition to the contradictory purport of the language employed in the governing regulation, there is not a shred of evidence in the record manifesting its involvement in any event. The burden of the argument is therefore more appropriately directed to those officials charged with responsibility for formulating procurement policy and effectuating it by adoption of appropriate contract language and regulations. Should those officials conclude that neutralization of the vice of unbalanced bids can best be accomplished by the de novo repricing of excess or short-fall procurement under an estimated quantity contract, they can readily adopt language to that end. Pacific Architects & Engineers Inc. v. United States, 491 F.2d 734, 203 Ct.Cl. 499 (1974). To date, this has apparently not been done. For this court, in the name of "interpretation", to undertake the implementation of a totally unarticulated procurement policy, however worthy, would amount to an impermissible overreaching of its legitimate role.

To secure a reduction in contract unit price for those quantities in excess of 115 percent of estimate, the Government was required in this instance to demonstrate by a preponderance of the evidence that the reduction sought represented a "decrease in costs due solely to the variation above 115% * * * of the estimated quantity". To say nothing of a preponderance, the present record contains no evidence whatever indicating the realization of cost economies attributable to excess volume. Plaintiff is therefore entitled to recover on behalf of its subcontractor, Western Waterproofing.

## CONCLUSION

For the reasons given, defendant's motion for summary judgment is denied, plaintiff's motion for summary judgment is granted, and judgment entered for plaintiff in the amount of $81,784.23.