**BURNETT CONSTRUCTION COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 636–87C.

United States Claims Court.

May 15, 1992.

...

Russell E. Yates, Denver, Colo., for plaintiff.

Richard P. Nockett, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C., with whom were David M. Cohen and Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

HORN, Judge.

### BACKGROUND

This case is before the court on the plaintiff's Motion for Partial Summary Judgment and the defendant's Cross–Motion for Summary Judgment. The plaintiff, Burnett Construction Company (Burnett), filed this action pursuant to 41 U.S.C. § 609(a)(1) (1988). The jurisdiction of this court is uncontested.

The plaintiff challenges the denial by the contracting officer of its claim for an equitable adjustment under the "Variation in Estimated Quantity" clause (Variations clause) incorporated into its contract with the Federal Highway Administration, pursuant to 48 C.F.R. § 12.403(c) (1990). The plaintiff argues that the contracting officer's decision was in error and alleges that the government's interpretation of the Variations clause is incorrect as a matter of law. The defendant responds by agreeing that there are no genuine issues as to any material facts in dispute, but contends that it, not the plaintiff, is entitled to summary judgment.

After careful consideration of the briefs filed by the parties, the oral argument on the cross-motions for summary judgment, the supplemental filings submitted by the parties following the argument, and for the reasons discussed below, the court GRANTS the plaintiff's Motion for Summary Judgment and agrees that the plaintiff is entitled to an equitable adjustment under the Variations clause.

### FACTS

On December 6, 1984, the Federal Highway Administration Central Direct Federal Division awarded Contract No. DTFH68–85–C–90008 to the plaintiff, a Colorado corporation, duly authorized to conduct business in the States of Colorado, New Mexico, Utah and Arizona. The contract, a fixed-unit-price, estimated quantity contract in the sum of Three Million Five Hundred Twenty Thousand Nine Hundred Thir-

teen & 00/100 Dollars ($3,520,913.00), called for the construction of 13.55 miles of grading, drainage, base and asphalt surfacing on Route 1, the primary access into the Canyonlands National Park in Southeastern Utah. Notice to proceed with the project, designated "Canyonlands National Park Project 1(2), Island in the Sky," was issued to plaintiff on December 12, 1984. A total of 300 calendar days was allowed for completion of the work. Work commenced on December 17, 1984, and work under the contract was completed by the plaintiff on December 21, 1985.

The terms and conditions of the plaintiff's highway construction contract included applicable Federal Acquisition Regulation (FAR) clauses for construction contracts, Standard Specifications for the Construction of Roads and Bridges on Federal Highway Projects, FP–79 (Revised June 1981), Labor Standards Provisions, and Special Contract Provisions, Bid Schedule and Plans. The contract plans and bid schedule, which are a part of the contract, specified an estimated quantity of 7,500 M gallons [1] for contract pay item 207(1), denominated "Watering." This figure was based on an estimate of the volume of water that would be needed for dust and moisture density control on the road during construction.

The contract unit price for Item 207(1) was $5.00 per M gallon and was based on the plaintiff's bid price. During the course of completing the project, there was a substantial overrun in the quantity of water used. The actual quantity of water needed for completion of the project was 17,266 M gallons, or an overrun of approximately 230 percent, for which the plaintiff was paid at the contract unit price of $5.00 per M gallons.

The actual quantity of water used exceeded 115 percent the estimated quantity by 8,641 M gallons.[2] Both parties agree as to the total quantity of the overrun, and that the additional water was necessary and required for completion of the contract. The parties also agree that the government's project manager authorized and agreed to the excess water hauling, and that the amount of excess water hauled above the estimated quantity was certified by the government as actually having been hauled.

By correspondence, dated October 10, 1985, prior to completion of the contract, the plaintiff notified the government's project engineer that it requested an equitable adjustment in the contract unit price for the overrun of Item 207(1), pursuant to paragraph 52.212–11, "Variation in Estimated Quantity" clause.

The plaintiff, through its attorney, submitted a certified claim to the contracting officer pursuant to the Disputes clause, 48 C.F.R. § 52.233–1, dated September 17, 1986, for additional compensation in the sum of $264,362.00. As a basis for its claim, the plaintiff asserted that it had experienced a tremendous increase in costs as a result of an increase in volume to roughly 230 percent of the estimated quantity of water contemplated in contract Item 207(1), Watering. Therefore, the plaintiff claimed entitlement to an equitable adjustment under the "Variations in Estimated Quantity" clause 48 C.F.R. § 52.212–11. The amount of the claim was computed as follows:

| | |
|---|---|
| Total water used | 17,266 M gallons |
| 115 percent of plan quantity (7500 M) | 8,625 M gallons |
| Variation in quantity | 8,641 M gallons |
| | |
| Total cost of overrun | $263,155.00 |
| 8 percent G and A (overhead) | 22,883.00 |

1. "M" is a unit of measurement meaning 1,000; 1 M gallons thus equals 1,000 gallons of water.

2. 7,500 M gallons (the estimated quantity) × 1.15 = 8,625 M gallons (115% of the estimated quantity). 17,266 M gallons (the actual quantity used) less 8,625 M gallons = 8,641 M gallons (the overrun quantity).

| | |
|---|---:|
| 7 percent profit | <u>21,529.00</u> |
| Total | $307,567.00 |
| Less previous payment | (43,205.00) |
| 8,641 M gallons at $5.00 | |
| Total amount claimed | $264,362.00 |

In its initial claim submitted to the contracting officer, the plaintiff asserted that the Variations clause provided for a contract adjustment amounting to the actual costs incurred by the contractor for that quantity exceeding 115 percent of the estimated contract quantity. According to the plaintiff:

The claim of Burnett arose on June 21, 1985 which is the day following the 115% of the planned quantity was reached (June 20, 1985). The claim amounts rose each day to completion of the contract. Exhibits A, B and C to this letter detail the breakdown of charges upon which our claim is made. Furthermore, Exhibit D sets forth a summary of the costs and water usage used and shows a total claim of $264,362.00.

The contracting officer, in his final decision of March 23, 1987, denied the plaintiff's claim, as follows:

V. *Determination*

Based on the preceding findings of fact and applying the precedent set forth in applicable case law, it is my determination that since the Contractor's unit cost for the 8,641 M gallons overrun was not increased or decreased as a result of the overrun, there is no basis under the Variation in Estimated Quantity clause to equitably adjust the contract unit price. Accordingly, the Contractor's claim is denied in total.

DISCUSSION

Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language.[3] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c); Fed.R.Civ.P. 56(c). RUSCC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Assn. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990).

■ As stated in *Webster University v. United States*, 20 Cl.Ct. 429 (1990):

An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d

**3.** Since RUSCC 56(c) is closely patterned upon Fed.R.Civ.P. 56(c), precedent under the Fed. R.Civ.P. is relevant to interpreting RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

1560, 1562 (Fed.Cir.1987), while the materiality of a fact is determined by reference to applicable legal standards. *Id.,* 833 F.2d at 1567.

*Id.* at 432 (emphasis deleted). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

The nonmovant must do more than merely raise some doubt as to the existence of a fact; the nonmovant must make a showing sufficient to require submission of the factual dispute to a jury or judge. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557 (Fed.Cir.1988). Moreover, "[m]ere denials and conclusory statements" by the adverse party are not sufficient to preclude summary judgment. *Mingus v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987) (*citing, Barmag Barmer Maschinenfabrik AG v. Murata Machinery Ltd.,* 731 F.2d 831, 836 (Fed.Cir. 1984)).

The facts presented must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. at 147, 90 S.Ct. at 1602–03. If the moving party has carried its initial burden of showing that there is no genuine issue of material fact, then the nonmoving party bears the burden to present "specific facts showing that there is a genuine issue for trial." RUSCC 56(f); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Uniq Computer,* 20 Cl.Ct. at 228 (stating that the nonmovant "must proffer countervailing evidence sufficient to create a genu-

ine issue of material fact"); *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 89 (1989) (stating that the party opposing the motion must "prove by sufficient evidence that a genuine issue of material fact positively remains").

When making a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *see also, Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir. 1991). The judge must determine whether the evidence presents a sufficient disagreement to require submission to fact finding or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356. If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed. Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court added an additional provision to the long standing summary judgment guidelines outlined above when it indicated that the initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of

evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2554; *see also Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is then on the nonmoving party to present evidence in support of its case and show that a genuine factual dispute exists by making a showing sufficient to establish the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.,* 20 Cl.Ct. at 679. The logic behind this addition is simple. If under no scenario can the nonmoving party present the necessary evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may be made by the moving party and succeed, whether or not accompanied by affidavits and other documentary evidence in addition to the pleadings already on file.

▰ The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981) (holding that it is inappropriate to conclude that because both sides moved for summary judgement that both concede that the case is ready for disposition); *Home Ins. Co. v. Aetna Cas. & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d at 1391.

▰ Both parties agree that there are no genuine issues of material fact that would preclude summary judgment in this case. The only issue to be determined by the court concerns how to apply the Variations clause included in the plaintiff's highway construction contract to the facts of this case. The plaintiff contends that the Variations clause mandates an adjustment in the contract unit price for Item 207(1), Watering. The government, however, asserts that by seeking an equitable adjustment to the contract unit price for Item 207(1), the plaintiff is attempting to ameliorate the adverse effects of an improvidently low bid and shift its losses to the government.

Equitable adjustments are defined as "simply corrective measures utilized to keep a contractor whole when the government modifies a contract." [4] *Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963). "A contractor who has underestimated his bid or encountered unanticipated expense or inefficiencies may not properly use a change order as an excuse to reform the contract or shift its own risk or losses to the Government." *Pacific Architect & Engineers, Inc. v. United States,* 203 Ct.Cl. 499, 508, 491 F.2d 734, 739 (1974) (citations omitted).

The plaintiff admits that due to its own accounting mistake it underbid Item No. 207(1) for the hauling of 7,500 M gallons of water. The plaintiff further acknowledges that the actual cost of providing the water required for completion of the contract, both the adjustable and non-adjustable quantities, far exceeded the contract unit price of $5.00 per M gallon. However, the plaintiff has accepted its losses as to the

---

**4.** Where the government creates a contract authorizing a variation in estimated quantity, the government is, in effect, modifying the contract when such a variation occurs.

non-adjustable quantity of Item No. 207(1) and seeks an equitable adjustment only to the overrun quantity, as expressly provided for by the Variations clause.

In order to determine damages, plaintiff contends that "the difference between the actual unit cost of the overrun and the *contract unit price* should be used." (emphasis in original). The defendant, however, states the issue as follows: "Whether plaintiff is entitled to an equitable adjustment in the contract unit price for water under the variation in estimated quantity clause with respect to an overrun in the estimated quantity in the absence of a demonstrated increase in the unit cost for the overrun quantity that is attributable to the increase in volume." The government, therefore, maintains that the plaintiff is not entitled to an equitable adjustment in the contract unit price for the overrun under the Variations clause in the instant case because the plaintiff has failed to demonstrate that the unit cost for providing the necessary water increased as a result of the overrun and based on the theory that the proper measure of damages should be defined as the difference between the actual per unit cost of performing the overrun and the actual per unit cost of performing 115 percent of the total quantity.

It is not uncommon for government contracts to include provisions for contract price adjustments resulting from government-directed changes, acts, or omissions in order to accommodate the government's reservation of the right to change the terms and conditions of an existing contract, or create a contract authorizing a variation in estimated quantity. The Variations clause is one such clause. *See generally* John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 813–16 (2d ed. 1986); John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 403–08 (2d ed. 1986).

In government construction contracts, items of work based on estimated quantities are not infrequently priced in terms of estimated quantities, for which payment is based on unit prices. When actual quantities can not be accurately forecast, this method of pricing is used to evaluate bids and determine the initial contract price as well as to provide for an equitable method of pricing the actual quantities of the pay item ultimately used in completing the contract. When such pricing is used, the Variations clause is included to provide for the pricing of variations from the estimated quantities. According to Cibinic & Nash, this approach is to relieve the contractor of the risk of inaccurate estimates. John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 405.

The Federal Acquisition Regulations contain an entire subpart addressing variations in quantity. Subpart 12.4—"Variation in Quantity" is divided into three sections: § 12.401 "Supply Contracts;" § 12.402 "Construction contracts;" and § 12.403 "Contract clauses." Section 12.402 on Construction contracts begins, "[c]onstruction contracts may authorize a variation in estimated quantities of unit-priced items." 48 C.F.R. § 12.402 (1991).

Section 12.403 of the CFR Subpart directs which contract clauses are applicable when a contract allows for a variation in estimated quantity. Section 12.403(c) states, "The contracting officer shall insert the clause at 52.212–11, Variation in Estimated Quantity, in solicitations and contracts when a fixed-price construction contract is contemplated that authorizes a variation in the estimated quantity of unit-priced items." 48 C.F.R. § 12.403(c) (1991).

As directed by C.F.R. section 12.403(c), 48 C.F.R. § 52.212–11, "Variation in Estimated Quantity," is the clause designated to address the effects of any variation in the estimated quantity of a unit-priced item in government construction contracts. The pertinent provisions of this section provide:

As prescribed in 12.403(c), insert the following clause in solicitations and contracts when a fixed-price construction contract is contemplated that authorizes a variation in the estimated quantity of unit-priced items:

Variation in Estimated Quantity (APR 1984)

If the quantity of a unit-priced item in this contract is an estimated quantity and

the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. * * *.

48 C.F.R. § 52.212–11 (1991).

This court agrees with the words included in the Armed Services Board of Contract Appeals Concurring Opinion of Judge Sheridan in *Bean Dredging Corp.* that the theory behind the Variations clause:

is that both parties expect to be bound to the contract unit price within a prescribed reasonable range of the estimated quantities but that large variations may require some adjustments to the unit prices or the total contract price to prevent either windfalls or losses, potentially even immense windfalls or ruinous losses, to the contract. The object is to retain a fair price for the contract as a whole on the face of unexpectedly large variations from the estimated quantities on which bids are based.

*Bean Dredging Corp.*, 89–3 ENG B.C.A. (CCH) para. 22,034 at p. 110,824, 1989 WL 81107 (June 30, 1989) (Sheridan, A.L.J., concurring).

In the instant case, the parties agree that the contractor assumes the risk of a 15 percent variation in the actual quantities of water used. In other words, the parties are entitled to the benefit (or attributed the detriment, as the case may be) of their bargain with respect to variations within the prescribed percentage limitations (15 percent) upwards or downwards of the

clause. Moreover, there is no dispute concerning the amount of the overrun subject to adjustment under the Variations clause. The parties further agree that the actual unit cost of providing the necessary water far exceeded the contract unit price of $5.00. The question posed here by the parties concerns the reference price which the court should use to calculate the actual unit cost of the overrun quantity (8,641 M gallons), for which the price adjustment is claimed. In other words, should the court use the contract unit price ($5.00), or should the court use the actual experienced unit cost of watering the 8,625 M gallons, the unadjustable quantities of water used under the contract ($37.87), to determine whether the price for the 8,641 M gallons of adjustable, overrun quantities of water used should receive an equitable adjustment.[5] Whereas, the plaintiff believes it is entitled to be reimbursed for the difference between the actual unit cost of performance for the adjustable quantities of 8,641 M gallons (according to plaintiff $35.59) and the $5.00 contract price, the government interprets the portion of the Variations clause which reads "costs due solely to the variations above 115 percent" as requiring that the actual cost of watering the adjustable quantity (that portion over 115 percent) must vary from the actual cost of watering 115 percent of the estimated quantity (the 8,625 M gallons non-adjustable quantity).

The government relies on a 1975 decision issued by the United States Court of Claims, the predecessor to this court, in *Victory Construction Co. v. United States*, 206 Ct.Cl. 274, 510 F.2d 1379 (1975) (*Victory*). Although it appears that little precedent other than the *Victory* case is

---

5. Using the cost data which was before the contracting officer, and which is a part of the record before this court, it is possible to estimate a unit price of $35.59 for the overrun quantity of 8,641 M gallons. This figure is determined by dividing the total cost of the overrun ($307,567.00) by the variation in quantity (8,641 M gallons). Other cost data in the project record shows that the unit price for performing the non-adjustable units (115 percent of plan quantity, or 8,625 M gallons) was $38.13 per M gallons. After the contracting officer arrived at this actual cost figure for the non-adjustable units, the plaintiff argued that the costs incurred as a result of constructing holding ponds for the water would have been incurred regardless of the overrun and that these costs should be excluded in computing the adjusted unit price. Thus, applying this reduction, the actual cost of performing the non-adjustable units, 8,625 M gallons, including overhead and profit, was reduced to $37.87 per M gallons.

available to offer guidance in the area of calculating damages under the Variations clause, this court believes that the government has misread the Variations clause and also has misapplied the *Victory* ruling to support its position. In *Victory*, the Court of Claims was interpreting an earlier version of the Variations clause (32 C.F.R. § 7.603–27 (1967)), which differed significantly from the version applicable to the instant case (48 C.F.R. § 52.212–11 (1991)), because one of the key sentences at issue here ("[t]he equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity") was not included in the earlier version of the Variation clause. The plaintiff also argues, correctly, that the government's reliance in the instant case on *Victory* is misplaced, in part, because the Court of Claim's discussion of the revised language in the April 1968 Variations clause in the *Victory* opinion is at best dicta, and is not binding.

A proper analysis of *Victory* must include an examination of the Board of Contract Appeals (BCA) Opinion *Victory Construction Co., Inc. and Paul Krummel (Joint Venture)*, 69–2 ENG B.C.A. (CCH) para. 7920, 1969 WL 473 (October 1, 1969), which was the subject of the appeal before the Court of Claims. *Victory Constr. Co., Inc. v. United States*, 206 Ct.Cl. 274, 510 F.2d 1379 (1975). The dispute in *Victory* centered around the proper interpretation of a 1965, earlier version of the "Variations in Estimated Quantities" clause, which was a part of the old Defense Acquisition Regulations.[6] For purposes of our examination, the pertinent provisions of the former clause read:

Variations in Estimated Quantities

Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than fifteen (15%) percent above or below the estimated quantity stated in this contract, as it may hereafter be modified, an equitable adjustment in the contract unit price shall be made upon demand of either party. * * *.

32 C.F.R. § 7.603–27 (1965).

In *Victory*, Under the 1965 Variations clause, the government sought a downward adjustment in the contract unit price of five pay items on which overruns had been experienced as a result of additional work ordered by the government. The contracting officer in the case had written the contractor to notify it that downward adjustments in unit prices for excess quantities were warranted. Under the government's interpretation of the Variations clause, either party had the right to invoke the clause and to seek an equitable adjustment to the contract unit price after it became known that the actual quantities would underrun or overrun the estimated quantity by more than 15 percent.

When the government invoked the Variations clause, the contracting officer in *Victory* made it clear that the burden of proving the price which it should receive for the overrun units should be on the plaintiff. The contracting officer sought a cost proposal from the contractor reflecting the downward adjustment in order to determine the amount of the equitable adjustment. However, because the contractor had not kept separate cost account records on the cost of performing the excess work under the five pay items, it was impossible to determine the actual cost of performing the excess portion of the work. Therefore, the contracting officer was forced to develop his own formula for determining the amount of the equitable adjustment. The formula the contracting officer developed and employed to adjust the unit costs for the overruns was to average total direct

---

6. On September 19, 1983, a joint document issued by the General Services Administration, the Department of Defense and the National Aeronautics and Space Administration, established a new Federal Acquisition Regulation in Title 48 of the Code of Federal Regulations (C.F.R.). The FAR system replaced both the Federal Procurement Regulations System (FPRS) for civilian contracts and the Defense Acquisition Regulations (DAR) for defense contracts. This is a different version of the Variations clause from the one at issue before this court.

costs of performance. He then apportioned the total price figure among the five types of work in accordance with the proportion that the government's pre-bid estimate of the unit price for each bore to their sum. Finally, the contracting officer arrived at an adjusted unit price for the overrun within each category by simply dividing the total number of units involved (both adjustable and non-adjustable) into the aggregate price apportioned to each of the five categories.

In the contractor's appeal before the BCA, challenging the methodology used by the contracting officer to arrive at the figure for the equitable adjustment, the contractor took the position that the Variations clause became "operative and is for application only if an overrun in quantity causes an increase or decrease in the cost of performing the work." *Victory*, 69–2 ENG B.C.A. (CCH) para. 7920 at p. 36,836. The contractor took this position because, prior to making a bid for the work, and after examining the plans and determining that there would be overruns on the five items:

> the bid prices were established on the basis of anticipated quantities rather than the estimated quantities contained in the bidding schedule; ... and in as much as the overruns did not exceed those anticipated, the actual unit cost of performing the completed work did not increase or decrease by reason of the increased quantities.

*Id.* In denying the contractor's appeal to overturn the contracting officer's decision to award a downward adjustment to the government, the BCA adopted the same interpretation of the Variations clause as did the contracting officer, i.e., that the Variations clause "authorized an approach to the pricing of overrun quantities by reference not to a demonstrated differential between the cost of performing the overrun work and the estimated quantities of the same type of work, but to an average cost of the entire work." *Victory*, 206 Ct.Cl. at 283, 510 F.2d at 1384 (describing the decision of the contracting officer and the BCA in *Victory*).

The Court of Claims, however, rejected this interpretation saying that, "[t]o secure a reduction in contract unit price for those quantities in excess of 115 percent of estimate, the Government was required in this instance to demonstrate by a preponderance of the evidence that the reduction sought represented a 'decrease in costs due solely to the variation above 115 percent * * * of the estimated quantity.' " *Id.* at 288, 510 F.2d at 1387. In ruling that the government in *Victory* should be "confined in amount to such cost differentials as are *directly attributable to a volume deviation* greater than 15 percent from stated contract quantities," *Id.* at 287, 510 F.2d at 1386 (emphasis added), the Court of Claims was only rejecting the convoluted formula used by the contracting officer to arrive at the adjustment in *Victory*.

The "Variation in Estimated Quantity" clause at issue in this case has its genesis in the 1965 version of the "Variations in Estimated Quantities" clause which was a part of the old Defense Acquisition Regulations (DAR). That clause read, in pertinent part:

> Insert the following clause in contracts containing estimated quantity items when the Contracting Officer has reserved the right to vary the estimated quantity during the performance of the work to accommodate actual conditions encountered:
>
> Variations in Estimated Quantities
>
> Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than fifteen (15%) percent above or below the estimated quantity stated in the contract, as it may hereafter be modified, an equitable adjustment in the contract unit price shall be made upon demand of either party. * * *.

32 C.F.R. § 7.603–27 (1965).

The DAR formalized the Variations clause as a means to remedy quantity variations in government contracts, but the language in the preface to the 1965 Variations clause limited the clause's applicabili-

ty. The preface required the clause to be included in Defense Department contracts only "when the Contracting Officer has reserved the right to vary the estimated quantity during the performance of the work to accommodate actual conditions encountered." However, when a contracting officer ordered a contractor to perform unit priced work in excess of that contemplated when the quantity estimates were established, the Changes clause was considered the appropriate basis for an equitable adjustment—even where a Variations clause was included in a contract. *Morrison–Knudsen Co. v. United States*, 184 Ct.Cl. 661, 397 F.2d 826 (1968). In the alternative, material variations from government estimates of the quantity of work to be performed under a contract have been remedied using a Differing Sites Conditions or Changed Conditions clause. *See, e.g., United Contractors v. United States*, 177 Ct.Cl. 151, 368 F.2d 585 (1966); and *Fehlhaber Corp. v. United States*, 138 Ct.Cl. 571, 151 F.Supp. 817, *cert. denied*, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957). Therefore, even though the "Variations in Estimated Quantities" clause was created to address quantity variations, a Changes clause and a Differing Sites Conditions clause had been held to preempt the application of the Variations clause.

When the Differing Site Conditions clause or the Changes clause were used to remedy variations in quantities, adjustments in price were made to all quantities of a pay item, not just the overrun or underrun quantities. Therefore, in 1968, the Assistant Secretary of Defense (Installations and Logistics) revised the Variations clause in an effort to clearly define how quantity variations in Defense Department contracts were to be addressed. The revised Variations clause provided, in pertinent part:

Insert the following clause in contracts containing estimated quantity items:

Variations in Estimated Quantities

Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than fifteen percent (15%) above or below the estimated quantity stated in the contract, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above one hundred fifteen percent (115%) or below eighty-five (85%) of the estimated quantity.
\* \* \*

32 C.F.R. § 7.603–27 (1968).

The Defense Department made two significant changes to the Variations clause in its attempt to clarify how it wanted variations from government estimates to be addressed. First, the Department appeared to be trying to put the Variations clause on the same level as the Differing Sites clause and the Changes clause by amending the preface to the 1968 clause to require the addition of the Variations clause whenever there was a contract containing estimated quantities. Next, the language of the clause itself was changed to include the second sentence which specifically limits any equitable adjustment to the overrun/underrun quantities.

The "Notes Regarding Substantive Changes" issued by the Department of Defense following this revision, specifically state why the Variations clause was changed. "The clause in 7–603–27, 'Variations in Estimated Quantities,' is revised to make more explicit that only quantities which exceed 115%, or are less than 85% of the estimated quantities are subject to adjustment under this clause." [7] This shows that the reason for the change was to make it more explicit that the overrun/underrun quantities were the only quantities subject to an equitable adjustment in price.

The disagreement between plaintiff and defendant revolves principally around the question of how to apply the words "due

---

**7.** Armed Services Procurement Regulation (1963 Edition Revision), April 15, 1968, Rev. 27, Notes and Filing Instructions, p. III.

solely to" in that sentence of the Variations clause which reads: "The equitable adjustment shall be based upon any increase or decrease in costs *due solely to the variation* above 115 percent or below 85 percent of the estimated quantity." 48 C.F.R. § 52.212–11 (1991) (emphasis added).

When the Court of Claims in *Victory* wrote that the government should be "confined to recovering amounts *directly attributable to a volume deviation* greater than 15 percent from stated contract quantities," *Victory*, 206 Ct.Cl. at 287, 510 F.2d at 1386 (emphasis added), they were, in fact, interpreting the words "due solely to" included in the 1968 clarifying provision to the DAR Variations clause. "Directly attributable to a volume deviation" is not synonymous with the concept of "on account of a quantity overrun," as the government would have us believe. If, as indicated above, the intent of the 1968 change to the Variations clause was to clarify that only the overrun/underrun quantities (those quantities above 115 percent or below 85 percent) could be equitably adjusted in price, the government is incorrect when it alleges that the overrun/underrun has to cause the change in price. This court, therefore, takes a position consistent with the Court of Claims in *Victory* regarding how to implement the "due solely to" provision of the Variations clause.

Moreover, if in fact the goal of the Variations clause was to base the damages due a claimant under the clause on the adjustable/non-adjustable actual cost differential, completely absurd results would follow. The government maintains that the Variations clause is only applicable when there is a difference between the actual cost of performing the non-adjustable units and the cost of performing the adjustable units. If this court were to accept that interpretation, it would be the government that would be entitled to an equitable adjustment in this case because the record appears to establish that the unit cost of performing the overrun quantity went

down $2.28 per unit.[8] Furthermore, under the government's interpretation, in a situation when the actual unit cost of the adjustable quantities greatly exceeds the per unit cost of the non-adjustable quantities, but both actual cost figures are far below the contract unit price, a contractor, nevertheless, would nevertheless be entitled to an increase in the unit price for that bid item. The applicable Variations clause, by its own terms, dictates that an "equitable adjustment" of the unit price allowable overrun quantities is authorized under the conditions specified, it does not prescribe a mechanical computation, which might provide unjust enrichment to either party to the contract.

If the contractor was directed to water a new area not covered by the original contract requirements, the contractor could be fully compensated for the work under the "Changes" clause regardless of the contract unit price. There would also be no requirement that the contractor prove that its actual cost of watering each unit varied solely due to the fact that there was a change to the contract requirements. Similarly, under the "Differing Site Conditions" clause, if the nature of the work differed significantly from that indicated in the contract, the contractor could be entitled to an equitable adjustment. The contractor could be compensated in full for all allowable costs, regardless of whether it could demonstrate precisely how its costs varied on account of the changed condition or variation.

## CONCLUSION

For the reasons discussed above, the plaintiff's Motion for Partial Summary Judgment is, hereby, GRANTED and the defendant's Cross–Motion for Summary Judgment is DENIED.

The Variations clause, which was developed in recognition of the fact that, in some types of work, it is impossible to arrive at reasonably accurate estimates of the quantities of some operations to be performed,

---

**8.** Burnett's actual cost for performing the non-adjustable units was established at $37.87 by agreement of both parties. The cost of perform-ing the overrun quantities, according to the plaintiff, was only $35.59 per unit.

provides that unit prices set forth in the contract are to apply to all quantities of work within the range specified in the clause, and that either party may demand repricing of work which falls outside of that range. In situations in which the Variations clause is activated, however, normal principles of pricing equitable adjustments, such as are utilized under other standard government contract clauses, should apply.

The burden of proving the actual dollar amount per M gallon to which the plaintiff is entitled should be on the party demanding the equitable adjustment under the Variations clause. This approach is also consistent with the Court of Claims decision in *Victory*, which held that: "it was the Government, not the contractor, on whom devolved the burden of proving the extent of any downward departure from the unit prices established by the contract for the pay items comprising the excess work." *Victory*, 206 Ct.Cl. at 285, 510 F.2d at 1385. If the plaintiff can accurately document its damages, it will be entitled to an equitable adjustment in the contract price.

By separate Order, the court will schedule a status conference to determine what further proceedings will be necessary to reach a final, ultimate resolution to the present dispute. The court encourages the parties to work together, prior to the status conference, to see if the damages issue remaining in the case can be settled.

IT IS SO ORDERED.