**FOLEY COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 91–1308 C.

United States Claims Court.

Aug. 11, 1992.

Seth R. Price, Atlanta, Ga., for plaintiff.

Allen D. Bruns, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant. R. Dale Holmes, Dept. of the Army, of counsel.

## OPINION and ORDER

TURNER, Judge.

This action involves a contract to close four hazardous waste lagoons at the Lake City Army Ammunition Plant in Independence, Missouri. Plaintiff seeks judgment for the amount withheld from the contract price as the result of the government's unilateral downward adjustment (Count I) and also for additional overhead costs incurred when the contract period was extended due to a quantity overrun (Count II).[1] Defendant filed a counterclaim seeking a further downward adjustment to the contract price.

The parties filed cross-motions for partial summary judgment concerning Foley's Count I and the government's counterclaim, and the government filed a motion to dismiss or alternatively for summary judgment concerning Count II.[2] Oral argument was conducted on June 23, 1992. We conclude that Foley's motion for partial summary judgment on Count I of its complaint and concerning the government's counterclaim should be granted and that the government's related motion should be denied. We further conclude that the government's motion to dismiss Count II of Foley's complaint for lack of jurisdiction should be granted.

---

1. The complaint does not contain designations of separate counts. We do so for convenience in referring to the two bases for relief asserted by Foley.

2. The government filed its motion to dismiss Count II and for summary judgment on Counts I and II on January 2, 1992. Foley's cross-motion for summary judgment on Count I was filed on January 31, 1992.

## I

On September 28, 1988, the parties entered the contract in which Foley agreed to close the lagoons. Specifically, Foley agreed to treat waste water contained in the lagoons so that the lead content would be reduced to an appropriate level, to dispose of the waste water, and to remove and dispose of sludge and contaminated soil in EPA-approved hazardous waste landfills. Finally, the lagoons were to be backfilled with clay, graded, and seeded. Foley completely discharged its obligations under the contract.

This action arises out of performance of the sludge removal and disposal requirement. Foley agreed to remove and dispose of the sludge at a unit price of $308 per ton, based on an estimated quantity of 6,600 tons. In May 1989, Foley advised the United States that the quantity of sludge that would need to be removed would exceed the estimated quantity. The government instructed Foley to remove sludge in excess of the estimated quantity at graduated levels. Foley ultimately removed 23,-937.51 tons of sludge.

With respect to the first 7590 tons (that is, 115% of the contract amount),[3] the government paid $2,337,720, or $308 per ton. With respect to the remaining sludge, the government paid Foley $4,822,515.45, which equalled only $295 per ton. Foley submitted a certified letter to the contracting officer on February 26, 1991 requesting $212,517.63, the amount required to bring the total payment up to the contract unit price of $308 per ton for the excess tons removed. In this letter, Foley repeatedly mentioned that it also had a claim for extended overhead costs incurred because of the delay in completing the project. On March 11, 1991, Foley submitted another letter identifying $313,685.06 of extended overhead costs and certifying that the cost information was current and accurate.

In a final decision, the contracting officer determined that pursuant to the Variation in Estimated Quantities clause, Foley was entitled to its actual costs plus a reasonable profit for the removal of sludge above 115% of the estimated quantity. This amount was set at $3,780,685. The contracting officer also determined that Foley's extended overhead was $268,514. Thus, the total amount to which Foley was entitled for the removal work exceeding 115% of the estimated quantity, according to the contracting officer, was $4,049,199. Because Foley had already been paid $4,822,515.45 for the removal of sludge above 115% of the estimated quantity, the contracting officer demanded $773,316.45 from Foley.

Foley's complaint seeks $212,517.63 as the contract balance for removing sludge in excess of 7590 tons (Count I) and a reasonable equitable adjustment for extended office overhead during the increased time of performance necessitated by the increased quantity of sludge (Count II). The government's counterclaim seeks the amount allegedly overpaid to Foley.

## II

In Count I, Foley asserts entitlement to the full contract unit price for each ton of sludge removed in excess 7590 tons.[4] The government claims that the unit price should be adjusted downward for the excess tons. Because the government believes that the correctly adjusted amount is less than that initially paid to Foley, it believes Foley should repay the difference.

The government contends that three contract provisions entitle it to a downward adjustment: the Changes clause, the Differing Site Conditions clause and the Variation in Estimated Quantities (VEQ) clause.

### A

■ Throughout the course of performance, the government consistently maintained that Foley would be compensated pursuant to the VEQ clause. The govern-

---

3. The Variation in Estimated Quantities clause establishes a range between 85% and 115% of the estimated quantity in which the unit price in the contract may not be altered.

4. Throughout this opinion, we will refer to the first 7590 tons, or 115% of the estimated quantity, as the "base" units and the sludge exceeding 7590 tons as the "excess" units.

ment never told Foley that it intended to make a downward adjustment pursuant to the Changes clause or Differing Site Conditions clause. Nevertheless, when the government answered Foley's complaint in this action, it asserted a right to an adjustment under both of those clauses. First, the government contends that Foley, with the approval of the contracting officer, used a different method to remove the sludge from the specifications requirement. Although no change order was issued, the government asserts that this constituted a "constructive change" which entitles it to an adjustment under the Changes clause.[5]

Furthermore, the government contends that the variation in sludge quantities constituted a category one "differing site condition" which would entitle it to a downward equitable adjustment under the Differing Site Conditions clause.[6] The government argues these clauses justify not only an affirmative defense to Foley's claim, but also a counterclaim.

■ We conclude that this court lacks jurisdiction to address the government's defenses and counterclaims based on the Changes clause and the Differing Site Conditions clause because they were not the subject of a decision by the contracting officer. Section 605(a) of title 41, U.S.C., provides, in pertinent part:

All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter.

It is settled that this requirement is jurisdictional. *See Placeway Constr. Corp. v. United States*, 920 F.2d 903, 906 (Fed.Cir. 1990) ("Because certification is not required for government claims, the Claims Court would have jurisdiction over an appeal from a decision of a CO, provided it is final."); *Wilner v. United States*, 26 Cl.Ct. 260, 277–78 (1992) (holding that the CDA's requirement that a claim by the government be subject to a contracting officer decision is jurisdictional); *Little River Lumber Co. v. United States*, 21 Cl.Ct. 527, 537 (1990) ("[T]he government's raising of a claim before a contracting officer is a prerequisite to Claims Court jurisdiction under the CDA....").

The government first relied on the Changes clause and Differing Site Conditions clause when it answered the complaint in this action. The contracting officer both denied Foley's claim and awarded the government damages pursuant to its interpretation of the VEQ clause.[7] Thus,

5. Paragraph (b) of the Changes clause provides in pertinent part: "Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the *Contracting Officer* that causes a change shall be treated as a change order under this clause...."

   Paragraph (d) of the clause provides in pertinent part:
   If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, *the Contracting Officer shall make an equitable adjustment and modify the contract in writing.* [Emphasis added.]

6. Paragraph (a)(1) of the clause defines a "differing site condition" as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract," and paragraph (b) provides, in pertinent part:

If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

7. In the first paragraph of the decision, the contracting officer says that the decision is made pursuant to the Changes and Variations in Estimated Quantities clauses. Nonetheless, the decision makes no further reference to the Changes clause; nor does it even mention the Differing Site Conditions clause. In any event, it is clear that the decision is not made pursuant to the Changes clause because it never addresses whether Foley changed its method of performance. The contracting officer states the issue as "what is the appropriate amount due for sludge removal costs above 115% of the estimated quantity...."

the sole issues related to the government's assertions based on the Changes and Differing Site Conditions clauses are whether the government's attempts to establish defenses and counterclaims based on these clauses constitute "claims" under § 605(a).

With respect to counterclaims, it is clear, as the language of the statute suggests, that the government must receive a final decision by the contracting officer in order to pursue the matter in the Claims Court. *See Joseph Morton Co. v. United States*, 757 F.2d 1273, 1279 (Fed.Cir.1985). With respect to defenses, however, there could be some doubt as to whether the requirement to have "claims" decided by a contracting officer bars the government from asserting new defenses in the Claims Court. In these circumstances, though, where the so-called "defense" is the government's justification for withholding the contract price, it is settled that the case presents a government claim, not a contractor claim. *See Placeway Constr. Corp. v. United States*, 920 F.2d 903, 906–07 (Fed. Cir.1990). In *Placeway*, the contractor had submitted an uncertified claim to the contracting officer for the contract balance. The contracting officer concluded that the contract balance could not be released because the government had a right of setoff. In reviewing a decision of the Claims Court, the Federal Circuit held that the government's assertion of a setoff was a government claim. *Id.* at 906. Accordingly, the court held that the Claims Court would have jurisdiction over the appeal from the contracting officer's decision even though the claim submitted to the contracting officer was not certified. *Id.* at 906–07. The court also reversed the Claims Court which had dismissed the claim for lack of jurisdiction because there was not a final decision by the contracting officer. Although the Federal Circuit acknowledged that a final decision by the contracting officer was required before the Claims Court could exercise jurisdiction over the dispute, it concluded that there was a final decision in that case. *Id.* at 906–07. Hence, it is clear that a contractor's challenge to the government's withholding of a contract balance presents a government

claim for purposes of § 605(a). Therefore, we conclude that both the counterclaim and the "defense" should have been the subject of a decision by the contracting officer.

For several reasons, it is irrelevant that the government is relying on the Changes clause and Differing Site Conditions clause merely as alternative theories to its argument under the VEQ clause, which is properly before this court. First, the requirement that contractors present all "claims" to the contracting officer prevents contractors from raising new bases for relief in the Claims Court that were not subject to a decision by the contracting officer, even if they provide alternate grounds to support claims validly asserted before the contracting officer. *See Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed.Cir. 1987) ("On appeal to the Board or in a direct access action in the Claims Court, a contractor may increase the amount of his claim ... but may not raise any *new* claims not presented and certified to the contracting officer."). When determining whether a contractor's attempt to alter its claim in the Claims Court constitutes a "new claim," courts look at whether the new issue is based on the same set of operative facts. *See SMS Data Prods. Group, Inc. v. United States*, 19 Cl.Ct. 612, 616 (1990); *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 91 (1989). Here, the government's claim based on the Changes clause involves proof that Foley altered its method of performance, and its claim based on the Differing Site Conditions clause involves proof that the quantity variation was unforeseeable. These two issues involve entirely different facts from the VEQ clause claim, which involves proof that there were quantity overruns. Moreover, it is not significant that the claims based on the three clauses are alternative theories in support of the same sum of money. *See R.J. Sanders, Inc. v. United States*, 24 Cl.Ct. 288, 292 n. 2 (1991); *Solar Turbines, Inc. v. United States*, 16 Cl.Ct. 304, 311 (1989). The government is subject to the same constraint as contractors when attempting to raise new claims (i.e., those not previously the subject of a final decision by

the contracting officer) in the Claims Court.

Furthermore, a significant feature of the Contract Disputes Act is that it gives the contractor an option of two fora to which it may appeal an adverse decision by a contracting officer. 41 U.S.C. §§ 606 & 609; *see Placeway Constr. Corp.*, 920 F.2d at 907 ("[T]he CDA recognizes that a single government contract may give rise to more than one claim, and that a contractor may pursue his rights by filing 'two or more suits' in either one or more fora."). To allow the government to assert alternate grounds in support of a contracting officer's decision, which were not the subject of that decision, would deprive contractors of the opportunity to choose the forum for that particular claim. Likewise, by failing to rely on these clauses at the contracting-officer stage, the government has circumvented one of the major purposes of the Act—encouraging settlement. *See* John Cibnic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 981–82 (1985) (discussing the contracting officer's obligation to attempt to negotiate a settlement). Accordingly, we conclude that this court lacks jurisdiction over the government's counterclaims and defenses based on the Changes and Differing Site Conditions clauses because they have not been the subject of final decisions by the contracting officer.

**B**

■ The government's final argument that it is entitled to a downward adjustment in the contract price for the quantity overruns relies on the VEQ clause. The VEQ clause provides, in pertinent part:

> If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. *The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity.*

(Emphasis added.) The parties agree that only the tons of sludge removed in excess of 115% of the estimated quantity are subject to adjustment under the clause but disagree on the basis for the adjustment. Specifically, the disputed issue is how the phrase "due solely to the variation" should be interpreted.

Foley relies on *Victory Construction Co. v. United States*, 206 Ct.Cl. 274, 510 F.2d 1379 (1975), which held that the party seeking an adjustment must show that the contractor achieved per-unit cost savings, or incurred per-unit cost increases, solely as a result of the quantity overrun. The government's position is that the VEQ clause requires a complete repricing with respect to quantity overruns exceeding the established range, so that the contractor is entitled to a price that would provide actual costs plus a reasonable profit for the excess units. The government contends that *Victory Construction* is either distinguishable or that the relevant portion is dicta. It relies primarily on *Appeal of Bean Dredging Corp.*, 89–3 B.C.A. ¶ 22,034 (June 30, 1989). We first examine the precise holding of *Victory Construction* and then consider whether any of the distinctions drawn in *Bean Dredging* are persuasive.

### 1. *Victory Construction*

In *Victory Construction*, a contractor filed suit in the Court of Claims to challenge an adverse decision by the Corps of Engineers Board of Contract Appeals (Board), which had upheld the contracting officer's decision as to the amount of compensation due to the contractor pursuant to a VEQ clause. The Court of Claims adopted the opinion of Trial Judge Willi reversing the Board's decision.

First, the court overruled the Board's holding regarding burden of proof. The Board had required the contractor to affirmatively justify the amount it sought, instead of requiring the government to prove that it was entitled to a downward adjustment. The court held that "it is clear in any event that as the proponent of the equitable adjustment, it was the Govern-

ment, not the contractor, on whom devolved the burden of proving the extent of any downward departure from the unit prices established by the contract for the items comprising the excess work." *Victory Constr.*, 206 Ct.Cl. at 285, 510 F.2d at 1385.

Second, the court overruled the Board's holding regarding the basis of the adjustment. The Board had interpreted the VEQ clause as requiring a repricing of excess quantities based on the average cost for the entire quantity (both base and excess) plus a reasonable profit. The court, in rejecting the Board's interpretation, concluded:

It is difficult to imagine definitive language [referring to the 1968 version of the VEQ clause] that would more clearly convey an absolute limitation on the metes and bounds of inquiry in the determination of a departure from contract unit prices in the pricing of work outside the parameters of permissible variance. The language is fully as explicit in specifying the basis for any recasting of prices as it is in mathematically defining the volumetric prerequisite to any adjustment at all. Distinctly, the proponent of an adjustment is told that it will be confined in amount to such cost differentials as are directly attributable to a volume deviation greater than 15 percent from stated contract quantities.

*Id.* at 286–87, 510 F.2d at 1386. Finally, the court stated: "[I]t is simply not reasonably possible to conclude, as did the Board, that the implementary quantity variance clause of the subject contract ' * * * contemplate[s] a complete repricing of those contract items which vary from the estimated quantities by more than 15%.' " *Id.* at 287, 510 F.2d at 1386 (quoting *Appeal of Victory Constr. Co., Inc.*, 69–2 B.C.A. ¶ 7920 (1969)).

The government contends that the court's interpretation of the 1968 regula-

tion (similar in all relevant aspects to the 1984 provision at issue here) is dicta.[8] The court construed a contract that contained the 1965 version of the Variation in Estimated Quantities clause. The 1965 version, however, did not contain the provision that is currently the second sentence of the clause ("The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity."). This sentence was first incorporated in the 1968 version of the clause. Nonetheless, the *Victory Construction* court relied upon this amendment as a clarification that demonstrated the meaning of the 1965 regulation. *See Victory Constr.*, 206 Ct.Cl. at 286, 510 F.2d at 1386.

For the government's assertion to be valid, the court's reliance on the 1968 version of the regulation would have to be irrelevant to the outcome of the case. *See* Black's Law Dictionary 967 (5th ed. 1979) (defining "obiter dictum" as "[w]ords of an opinion entirely unnecessary for the decision of the case"). The court's interpretation of the 1968 version was quite relevant to the *Victory* result. After reciting the second sentence of the 1968 version of the clause, the Court of Claims squarely held that the adjustment was confined to "such cost differentials as are directly attributable to a volume deviation." *Victory Constr.*, 206 Ct.Cl. at 287, 510 F.2d at 1386. The court held the contractor entitled to the full contract unit price for each of the excess units (rather than the lower amount awarded by the contracting officer) because the government failed to meet its burden of proof under this exacting standard. The government is objecting to the legal conclusion made by the Court of Claims that it was proper to rely on the 1968 regulation. The Claims Court, however, is bound by decisions of the Court of Claims. *South Corp. v. United States*, 690

**8.** In a recent Claims Court decision, *Burnett Construction Co. v. United States*, 26 Cl.Ct. 296, 303–04 (1992), another judge of this court suggests that the discussion of the 1968 version of the regulation in *Victory Construction* is dicta and not binding. Likewise, the concurring opinion in *Bean Dredging* argues that the Court

of Claims did not intend to adopt Trial Judge Willi's interpretation of the 1968 version of the regulation. *See Bean Dredging*, 89–3 B.C.A. ¶ 22,034 at 110,824–827. For reasons stated in the text, we have a different view. Further, Court of Claims precedent is consistent with our independent interpretation.

F.2d 1368, 1370–71 (Fed.Cir.1982). Having concluded that the *Victory Construction* court's interpretation of the VEQ clause is not dicta, we turn to the government's claim that the decision is distinguishable.

### 2. *Bean Dredging*

The government, relying primarily on *Bean Dredging*, also contends that *Victory Construction* is distinguishable from the present case on several grounds. In *Bean Dredging*, a contractor sought an equitable adjustment pursuant to the VEQ clause. The plaintiff-contractor was unfortunate in that the actual unit cost for dredging the excess quantity far exceeded the contract unit price; however, there was no evidence that the actual unit cost of dredging the excess varied from that for the base quantity. The Board awarded the contractor the difference between the actual unit cost on the excess units and the contract unit price. The Board concluded that *Victory Construction* was distinguishable because of the absence in *Victory Construction* of a Pricing of Adjustments clause and because *Victory Construction* did not address a situation where actual unit costs differed materially from contract unit prices.

First, the Board stated that *Victory Construction* was distinguishable because the *Victory* contract did not contain a Pricing of Adjustments clause. *Bean Dredging*, 89–3 B.C.A. ¶ 22,034 at 110,821. This distinction is simply not relevant. The Pricing of Adjustments clause provides:

When costs are a factor in any determination of a contract price adjustment pursuant to the Changes clause or any other clause of this contract, such costs shall be in accordance with Part 31 of the Federal Acquisition Regulation and the DoD FAR Supplement in effect on the date of this contract.

This clause controls the *amount* of an equitable adjustment when actual costs are relevant; it has no application in determining whether the contractor's recovery should be based on costs rather than the contract price.

Second, the Board said that the analysis in *Victory Construction* is inapplicable where actual unit costs differed materially from contract unit prices. *Bean Dredging*, 89–3 B.C.A. ¶ 22,034 at 110,821. The Board said that the clause should not be interpreted to shift "the risk of an improvidently low bid to the Contractor or an inordinately high bid to the Government with respect to quantities outside those variation limitations." *Id.* at 110,822; *see also Burnett Constr. Co. v. United States*, 26 Cl.Ct. 296, 307 (1992) (concluding that the VEQ clause does not require an adjustment that would provide unjust enrichment to either side). The Board concluded that absurd results follow if this distinction is not made because a contractor would be entitled to an upward adjustment if the unit cost of the excess exceeded the unit cost of base quantities even if both costs were below the contract price; likewise, the government would be entitled to a downward adjustment if the unit cost of the base quantities exceeded the unit cost of the excess quantities but both costs were above the contract price.

Regardless of the appeal these arguments may have, the distinction drawn by the Board and urged by the government cannot be reconciled with the phrase "increase or decrease in costs due solely to the variation." Nor is this distinction consistent with the *Victory Construction* court's interpretation of this phrase, which is binding on this court. We conclude that the clause requires the proponent of an adjustment to show that there are unit cost differentials between the base and excess units and that the differentials resulted from economies of scale associated with the quantity overrun. Although the clause does not specify that there must be *unit* cost differentials, this is the most plausible reading. It would be somewhat illogical to expect that "costs" in the context of the VEQ clause—the clause dealing exclusively with unit pricing—referred to "total costs." Nonetheless, the government argues that because Foley's total costs increased as a result of removing more than 7590 tons of sludge, the government is entitled to reprice the units in excess of 7590 tons to actual costs plus reasonable profit.

That the clause does not require a complete repricing is most clear when one considers the situation of a quantity underrun. If a contractor encountered only 80% of the estimated quantity, under the government's theory that contractor would receive costs plus a reasonable profit for every unit. Such contractor would not obtain the benefit or detriment of the bid price for any portion of the contract, whereas in this situation the contractor should be entitled to the contract price, altered by any unit cost differential due to economies of scale. An analogous result should apply to quantity overruns. In addition to showing a unit cost differential, the phrase "increase or decrease in costs due solely to the variation" requires the proponent of an equitable adjustment to show causation; that is, that any cost differential resulted from economies of scale and not from some other factor.

### 3. *Burnett Constr. Co.*

In *Burnett Constr. Co.*, another judge of this court articulated a limited reading of the holding in *Victory Construction* that would reconcile *Victory Construction* with the government's reading of the VEQ clause. In *Burnett,* the court said that *Victory Construction* was simply "rejecting the convoluted formula used by the contracting officer to arrive at the adjustment." *Burnett*, at 305. Apparently it was impossible in *Victory Construction* to determine the actual cost of performing the excess portion of work. Therefore, the contracting officer developed a complicated formula for determining the equitable adjustment that involved apportioning total costs for both the base and excess units. *Burnett* acknowledged that *Victory Construction* interpreted the words "due solely to the variation" to mean "directly attributable to a volume deviation." *Burnett* concluded, however, that " '[d]irectly attributable to a volume deviation' is not synonymous with the concept of 'on account of a quantity overrun.' " *Id.* at 307. Under this view, *Victory Construction* was a very limited rejection of the formula that used costs for the base quantity to determine the amount of the adjustment for the excess quantity. In our view, this ratio-

nale is not consistent with *Victory Construction*'s clear rejection of a complete repricing standard. Moreover, it distorts the plain meaning of the VEQ clause.

### C

Accordingly, we conclude that the government is entitled to a downward adjustment only if it can show that Foley's per-unit cost for removing sludge in excess of the VEQ range decreased *solely* as a result of such excess. If it fails to make this showing, Foley is entitled to the amount withheld by the government. Hence, we conclude that Foley's motion for summary judgment on the liability issue of Count I of its complaint and the government's counterclaim should be granted.

### III

■ In Count II of the complaint, Foley seeks extended field office overhead for the 272–day delay in completing the project. The government contends that this claim should be dismissed for lack of jurisdiction or, alternatively, that it is entitled to summary judgment as a matter of law.

■ The government contends that Foley did not satisfy the certification requirements of the CDA with respect to its claim for extended overhead. The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). In addition the statute requires:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1). Compliance with these requirements is a jurisdictional prerequisite to the filing of a complaint under the CDA. *See United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 579 (Fed.

Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991); *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426, 1428 (Fed.Cir.1989).

Foley submitted a letter on February 22, 1991 containing a proper certification that requested $212,517.63 pursuant to the VEQ clause for increased quantities of sludge. This letter provided great detail concerning the course of performance and included several references to Foley's entitlement to delay costs. On March 11, 1991 Foley supplemented its February 22 letter with precise cost information on the extended overhead claim. In this letter, Foley certified that the cost information was accurate and complete.

■ Neither of the submissions, standing alone, is sufficient to constitute a certified extended overhead claim. The first letter does not constitute a "claim" for extended overhead. Although the Contract Disputes Act does not specify a particular form for making a "claim," the Federal Circuit has held that a "claim" is a written statement that gives the contracting officer "adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). Even if the references to Foley's entitlement to delay costs could be considered notice of the *basis* of the claim, the letter does not give any indication as to the *amount*.

■ The second letter is insufficient because it does not include a certification which follows the required statutory language. All that is required is that a certification "substantially comply" with the statutory language. *United States v. General Elec. Corp.,* 727 F.2d 1567, 1569 (Fed.Cir. 1984); *Alcan Elec. & Eng'g Co. v. United States,* 24 Cl.Ct. 704, 707 (1992); *Young Enterprises, Inc. v. United States,* 26 Cl. Ct. 858, 861–862 (Cl.Ct.1992). Foley's certificate, however, entirely omits the first and third elements required by § 605(c)(1). In order to "substantially comply" with § 605(c)(1), a certificate must reasonably satisfy each of the three elements. *See ReCon Paving, Inc. v. United States,* 745 F.2d 34, 40 (Fed.Cir.1984) (holding that a certificate of current cost or pricing data does not satisfy the certification requirement).

■ Foley contends that the second letter should be viewed as a supplement to the first letter so that the certificate in the first letter could cover both claims. Although it is not necessary that a claim and a certificate including each of the three elements be contained within the same document, *see United States v. General Elec.,* 727 F.2d at 1569, it is required that a claim and the proper certification be submitted to the contracting officer simultaneously. *See W.H. Moseley Co. v. United States,* 230 Ct.Cl. 405, 407, 677 F.2d 850, 852, *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *Alcan Elec. & Eng'g Co.,* 24 Cl.Ct. at 706. Hence, we conclude that the two submissions, which are each insufficient individually to constitute a certified claim for extended overhead, may not be combined to satisfy the certification requirement.

Finally, Foley contends that the two amounts claimed—extended overhead and the contract balance—constitute one claim. Under this theory, even though Foley did not request $313,685.06 for extended overhead in the first letter, it was entitled to increase the amount it originally requested because the two amounts spring from the same claim. As we said in Part II A above, the standard for determining whether the claim for extended overhead constitutes a new claim or merely an increase in the amount of the claim for the contract balance is whether the two issues are based on the same set of operative facts. The claim for the contract balance involves proof (or stipulation) that there were quantity overruns. The claim for extended overhead involves proof that the delay was reasonable and that it was not caused by the contractor. We conclude that these are two separate claims. They involve different theories of liability and different facts. Accordingly, the government's motion to dismiss Count II of Foley's complaint must be granted.

Because we hold that Foley did not submit a properly certified claim for extended

overhead to the contracting officer, we have no occasion to address the government's motion for summary judgment concerning Count II.

## IV

### A

Based on the foregoing, plaintiff's motion filed January 31, 1992 for partial summary judgment with respect to count I of the complaint (pertaining to application of VEQ clause to unit price) is GRANTED, and defendant's correlative motion filed January 2, 1992 for summary judgment on count I is DENIED. Entry of judgment for plaintiff pursuant to ruling on summary judgment motions shall be withheld pending resolution of all other issues.

Further, defendant's motion filed January 2, 1992 to dismiss count II of the complaint (pertaining to claim for extended field office overhead) for lack of jurisdiction is GRANTED. It is determined that there is no just reason for delay of judgment on said Count II. Therefore, pursuant to RUSCC 54(b), it is ORDERED that judgment shall be entered forthwith dismissing the complaint for lack of jurisdiction to the extent that it asserts a claim for extended field office overhead (Count II). No costs.

### B

The parties shall file a joint status report not later than Monday, September 14, 1992 advising of (1) the most convenient location for trial, (2) the time which will be required for trial and (3) any other matters which the parties deem appropriate.

It is contemplated that precise dates for pre-trial conference and trial and for submission of memoranda of contentions and other items described in paragraphs 11 through 15 of Appendix G, RUSCC will be selected during an unrecorded telephone conference with counsel to be initiated by the court upon receipt of the joint status report designated in the preceding paragraph.