618 A.2d 256

GENSTAR STONE PAVING PRODUCTS COMPANY, INC.

v.

STATE HIGHWAY ADMINISTRATION.

No. 507, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Jan. 11, 1993.

Donald A. Tobin (Scott A. Livingston and Bastianelli, Brown & Touhey, Chartered, on brief), Washington, DC, for appellant.

Dana A. Reed, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before WILNER, C.J., and MOYLAN and BISHOP, JJ.

WILNER, Chief Judge.

This appeal is from an order of the Circuit Court for Baltimore City reversing a decision of the State Board of Contract Appeals. It takes us into the arcane world of State (and Federal) procurement and, in particular, requires us to construe a mandatory clause in a road construction contract. The underlying facts are not in dispute.

In July, 1986, the State Highway Administration (SHA) awarded appellant a $5,951,622 contract to make resurfacing improvements to a two-mile stretch of the Baltimore Beltway. Both the bid and the contract were divided into many separate bid items; some of them called for a lump sum price—a single amount to be paid for that item of work, no matter what quantity of that work might ultimately prove necessary—while others (most) specified unit prices. The unit price items stated a price per unit (per ton, per day, per square or linear foot), the number of units that SHA estimated the job would entail, and an aggregate price determined by multiplying the unit price by the number of SHA-estimated units.

Appellant was required under the contract to maintain traffic flow during the construction work, and several of the items related to that function. Item 1002 called for a lump sum for "Maintenance of Traffic," and on that item appellant bid (and the contract stated) $67,500. Other items showed unit prices for temporary traffic signs, temporary pavement striping tape, the removal of that tape, and barrier walls. Item 1006 contained a unit price for arrow boards—lighted signs forming the shape of an arrow that direct traffic into adjacent lanes when one or more lanes are closed because of the construction work. We are concerned here with the arrow boards.

The contract specified that the method of measurement and basis of payment for this item "shall be at the contract unit price bid per unit day." By "unit day" was meant that

each arrow board used would be paid for once for each day of use, no matter how many times during the day it was moved or replaced. The contract also stated that the contract unit price "shall be full compensation for all labor, materials, equipment, tools and incidentals required to set up and operate at the site and at any relocated sites as required."

SHA estimated that the job would require 200 unit days of arrow boards. In preparing its bid, however, appellant concluded that SHA's estimate was far too low and that the job would require 555 unit days of arrow board. What it did, therefore, was as follows: (1) it determined that the actual cost of an arrow board for a unit day was $45/board; (2) it estimated that the additional crew and equipment costs associated with the arrow boards would be $783/day; (3) it multiplied the $783 by the 327 additional days it figured the extra crew and equipment would be needed, producing a cost of $256,041; (4) it then multiplied the actual $45 cost by 555 days, yielding $24,975, and added that amount to the $256,041, producing a combined cost of $281,016; (5) it divided that combined cost by 555, producing a per diem cost of $506; and (6) to that amount it then added (i) a $94 markup (making $600), (ii) $200 more on the assumption that a second arrow board crew shift would be required on one-third of the 555 crew arrow board days (raising the unit cost to $800), and (iii) $100 for overhead and profit, making a final unit price of $900.[1]

As things turned out, appellant's time estimate was much closer to the mark than SHA's. The job required 514 unit days of arrow board.

Part of the State's procurement regulations is COMAR 21.07.02.03, which requires that every State construction contract containing estimated quantity items include the following "variations" or "VEQ" (variations from estimated quantities) clause:

---

1. Somewhere a $1 discrepancy occurred. The actual figure prior to the addition of overhead and profit was $801.

"Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than twenty-five percent (25%) above or below the estimated quantity stated in this contract, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above one hundred twenty-five percent (125%) or below seventy-five percent (75%) of the estimated quantity." [2]

That clause, in conformance with the regulation, was included as General Provision 4.03 of the contract.

As noted, SHA estimated that the job would require 200 unit days for arrow boards; 125% of that estimate is 250 days which, for purposes of this Opinion, we shall refer to as the base units—units to be paid at the contract unit price without any adjustment. The job actually required 514 days, producing an overrun in excess of the base of 264 unit days; that overrun we shall refer to as comprising the adjustable units—those subject to equitable adjustment in accordance with the variations clause. After the job was completed, SHA examined unit prices for this item in bids on other jobs and, from that examination, found that the average bid price for Item 1006 was $55/unit day.[3] From this, it concluded that appellant's actual cost for the item did not exceed $55/unit day and that, as a result, the cost to appellant of the overrun, due solely to the overrun, was only that amount. As the contract price was $900/unit day, it demanded an equitable adjustment under GP 4.03 and actually withheld $223,080 ($900–$55 × 264 days) as a retainage. This was based on the notion that, in measuring any equitable adjustment under the clause, the proper approach was essentially to ignore the contract unit price with

---

**2.** There is additional language in the mandatory clause, but it has no application to this appeal, and so we have omitted it.

**3.** Because appellant was the sole bidder on this job, it was not possible to compare the $900 unit cost with other bids on this contract.

respect to the adjustable units and to pay only the actual cost of providing those units.

Appellant, as might be expected from the circumstances, had a very different view. It construed the clause as requiring SHA to demonstrate (1) that there was a difference between the actual unit cost of the base units (the arrow boards necessary for 250 unit days) and the actual unit cost of boards for the adjustable units (the 264 additional days), and (2) that the difference was due solely to the overrun. That difference, if it could be proved, would then be deducted from the contract unit price.

When the SHA procurement officer rendered his decision, appellant appealed to the State Board of Contract Appeals. At a hearing before that Board, SHA, through an accountant offered as an expert witness, recalculated its demand. Instead of relying on average bids on other jobs, as the procurement officer had done, the witness examined certain of appellant's records on this job and determined therefrom that (1) appellant's actual cost per unit day for arrow boards was $76 and (2) there would be no increase or decrease in that unit cost resulting solely from the extra 264 unit days. The witness concluded, however, that appellant had included in Item 1006 certain traffic maintenance expenses that should have been placed in other items and that there was a $385 per unit decrease in those costs with respect to the adjustable units. On that basis, SHA believed it was entitled to an equitable adjustment of $385/day for 264 days.[4]

The Board rejected both analyses, concluding that they were each "flawed by the assumption that a bid price is reflective of actual costs and that the cost for the overrun

---

4. The witness started with the costs included in arriving at the $900 contract price, other than the $100 for overhead and profit, or $801. From that he subtracted the $76 actual cost of arrow board, thereby producing a unit cost for base units of $725. From appellant's records, he estimated the actual unit cost for the adjustable units to be $340. He arrived at the estimated decrease in cost by subtracting $340 from $725.

quantity should be compared to the bid price." It was not the intent of GP 4.03, the Board held, "to allow either party the opportunity to renegotiate in hindsight a bid price when the actual cost is found to be too high or too low due to the variation in actual quantity necessary from the quantity estimated in the bid documents." Rather,

"[I]t is only the actual increase or decrease in costs for the quantity that exceeds 125% of the estimate based on a comparison of actual costs before and after 125% of the estimated quantity is reached and due solely to the variation in quantity that GP 4.03 gives as a remedy. It is not an escape hatch from a bid price which in hindsight was a 'bad deal' for either party."

Under SHA's approach, it was not necessary to determine, or consider, the actual cost to appellant of providing 250 unit days of arrow board, and it therefore made no such determination. It calculated only the actual cost of providing the 264 overrun unit days, comparing that to the contract unit price (less, it seems, the $100 included therein for overhead and profit). As noted, the Board rejected that approach and construed GP 4.03 as requiring a comparison of actual costs for the adjustable and base units and a showing that the actual unit cost for the adjustable units was less than that for the base units. As SHA failed to make that showing, the Board concluded that it had failed to show a decrease in the costs for the 264 unit days of arrow board overrun due solely to the variation in quantity and thus had not established its right to an equitable adjustment.

SHA appealed that decision to the Circuit Court for Baltimore City which, after a non-evidentiary hearing, reversed the Board and concluded that SHA *was* entitled to an equitable adjustment. In its remarks from the bench, the court found troubling what it regarded as appellant's "machination" of "inflat[ing] this particular item to an amount of $826.00 in excess of that which is its actual unit cost per arrow board" by including in Item 1006 costs that were really attributable to Item 1002 (traffic maintenance), fully

expecting a substantial overrun. That conduct, or "machination," resulted in an "excess profit" which the court found to be against public policy. Implicitly, the court construed GP 4.03 as requiring no more than a comparison between the actual cost of supplying the arrow boards during the overrun period and the unit price under the contract. If, as the court concluded, the actual cost (of $76) was less than the contract unit cost ($900), SHA was entitled to an equitable adjustment. It therefore remanded the case to the Board for a determination, in accordance with the court's views, of the amount of that adjustment.

■ Appellant is once again the aggrieved party and has brought this appeal, raising nine issues (some with several subparts). In essence, there is but one issue—the proper construction of GP 4.03. As we indicated, the underlying facts are not in substantial dispute. Because the issue is one of "statutory" interpretation—the interpretation of a regulation—it is one of law, upon which a court may freely substitute its judgment for that of the administrative agency. Moreover, because the contract language mirrors exactly the required language of the regulation, to the extent there is any ambiguity, we look to the intent of the State in adopting the regulation and do not, as appellant suggests, apply the rule of *contra proferentum* and construe the clause against SHA because it was the "draftsman."

This is a matter of first impression in Maryland. State law has required a variations clause of this type at least since 1980 (*see* 1980 Md.Laws, ch. 775, enacting § 3–602(a) to Md.Code, art. 21; current Md.Code, State Fin. and Proc. art., § 13–218(a)(3)). The regulation implementing that statutory direction and mandating the specific language of the clause was adopted in 1981 by each of the State procurement agencies—the Board of Public Works, the Comptroller of the Treasury, the Secretaries of General Services, Budget and Fiscal Planning, Personnel, and Transportation, and the President of the University of Maryland. *See* 8:9 Md. Reg. S–1; 8:13 Md.Reg. II–3, II–9.

The record reveals no helpful legislative history with respect to the regulation other than its similarity to a comparable Federal procurement regulation currently codified in 48 C.F.R. § 52.212–11 (1991). Both sides thus look to how that Federal regulation evolved and has been interpreted. Two very different, and inconsistent, views have been taken of the Federal clause.

The general concept of, or right to, an "equitable adjustment" in a contract price based on changes in the scope of the work or on unanticipated working conditions is something Maryland borrowed from Federal procurement experience, and it applies in a number of different contexts. In *Md. Port Adm. v. C.J. Langenfelder & S.*, 50 Md.App. 525, 540, 438 A.2d 1374 (1982), we described its function thusly, quoting from *Bruce Construction Corporation v. United States*, 324 F.2d 516, 518, 163 Ct.Cl. 97 (1963):

"Equitable adjustments in this context are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract. Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification, it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification."

*See also General Builders Supply Co. v. United States*, 409 F.2d 246, 249, 187 Ct.Cl. 477 (1969); *Burnett Const. Co. v. U.S.*, 26 Cl.Ct. 296, 301 (1992).

We note these general statements because they serve as an important and convenient reference point. Excessive variations over or below estimates stated in the contract, upon which bids were based, can be like games of chance; who is helped and who is hurt can depend on a number of factors, including (1) whether the units actually required are less or more than the base amount; (2) the extent to which the contract unit price approximates the actual unit

cost to the contractor, of either the base or the adjustable units; (3) if the variation is due to an overrun, as here, whether and to what extent the unit cost for the overrun differs from the unit cost for the base units; and (4) the extent to which the contractor's unit cost for the base units is affected by the underrun or the overrun. When, in an overrun situation, the unit cost for the adjustable units proves to be less than the contract unit cost, it is the government that seeks the equitable adjustment, looking to that difference to measure the amount, the contractor arguing that the proper comparison is not with the contract unit cost but with the actual unit costs of the base units. When, on the other hand, the actual unit cost for an overrun variation is greater than the contract unit cost, the contractor seeks the equitable adjustment and it is the governmental entity that urges an actual cost versus actual cost comparison. If the variation arises from an underrun rather than an overrun, other considerations may also arise, depending on whether the unit cost of the reduced work is increased or decreased because of the reduction. We need to look, then, beyond the result produced by one interpretation or another in a particular case—whether it produces an excess profit or an excess loss—but consider more generally how the clause was intended to be construed in *any* case.

In urging its approach, appellant relies largely on principles announced in *Victory Construction Co., Inc. v. United States*, 510 F.2d 1379, 206 Ct.Cl. 274 (1975), which we shall refer to hereafter as *Victory*. That case is quite complex and fact-specific. Suffice it to say that there was an overrun on five unit price items in an Army Corps of Engineers construction job. The government, seeking a downward equitable adjustment, placed the burden of proving the actual cost of the overrun units on the contractor. The contractor did not keep separate records enabling it to determine those costs, however, and so the government calculated the overrun unit costs based on its estimate of the actual unit costs of the base units. The Board of

Contract Appeals sustained the Corps' decision, whereupon an appeal was taken to the Court of Claims.

In a per curiam opinion adopting the opinion of the trial judge, that Court reversed on a number of grounds. It first found error in the Board's refusal to give due consideration to an affidavit from the contractor attesting, in effect, that the contract unit prices fairly reflected the actual unit costs for the overrun units. It then faulted the Board for placing the burden on the contractor to prove its costs. As the proponent of the equitable adjustment, said the Court, "it was the Government, not the contractor, on whom devolved the burden of proving the extent of any downward departure from the unit prices established by the contract for the items comprising the excess work." 510 F.2d at 1385, citing *Nager Electric Co. v. United States*, 442 F.2d 936, 194 Ct.Cl. 835 (1971). Those two holdings alone would have justified the reversal. The Court went on, however, to conclude that the Board had also misconstrued the variations clause.

The clause actually inserted in the 1965 Victory contract was different than the one at issue here; it did not contain the second sentence of the clause, quoted above, and thus said nothing about the equitable adjustment being based on any increase or decrease in costs due solely to the variation. In 1968, prior to the Board's decision, a new mandatory clause, identical to that in appellant's contract, was promulgated.[5] Relying on an Armed Services Procurement Regulation cover sheet accompanying the revision, the Board concluded that the 1968 version was simply a clarification of the previous clause and that the two clauses were substantially the same. Although skeptical, the court accepted that conclusion for purposes of its discussion and decision and

---

5. There was one difference, but it is not germane to this appeal. The Maryland clause, as noted, gives a 25% leeway over and under the estimated number of units. The Federal clause gave a 15% cushion. Otherwise, the language of the 1968 Federal clause is the same as the 1981 Maryland clause.

thus, in effect, construed the very clause at issue here.[6] *Id.* at 1386.

That clause, said the Court at 1386, clearly defined the scope of the inquiry in determining an entitlement to and the amount of an equitable adjustment:

> "Distinctly, the proponent of an adjustment is told that it will be confined in amount to such cost differentials as are directly attributable to a volume deviation greater than 15 percent from stated contract quantities.... [I]t is simply not reasonably possible to conclude, as did the Board, that the implementary quantity variance clause of the subject contract ' * * * contemplate[s] a complete repricing of those contract items which vary from the estimated quantities by more than 15%.' "

To secure a reduction in contract unit price for those excess quantities, the Government was required to demonstrate that the reduction sought represented a "decrease in costs due solely to the variation above 115%." *Id.* at 1387. The record, however, contained "no evidence whatever indicating the realization of cost economies attributable to excess volume," and, for that reason, the Government had failed to show its entitlement to an equitable adjustment. *Id.*

Significantly, the Court addressed and rejected the very argument made by SHA and stressed by the circuit court in this case, namely, that such a narrow reading of the clause

---

**6.** Later additional research indicated that the reason for the change was that the former clause had sometimes been interpreted to permit a repricing of the base units as well as the adjustable units which, in the view of the Armed Services Procurement Regulation Committee, "would encourage bidders to submit unrealistically low unit prices for estimated quantities in the hope of later recovering their actual costs by a mere showing that such costs were incurred and reasonable" and thereby deprive the government of "the advantage gained from unit prices arrived at by competitive bidding." *See Clement–Mtarri Companies,* No. 38170 (Armed Services Board of Contract Appeals, filed July 8, 1992). Addition of the requirement that an equitable adjustment be based on increases or decreases in costs "due solely" to the variation would preclude a complete repricing of the entire item and focus just on the underrun or overrun.

would result in a windfall profit for the contractor and that a more expansive interpretation was necessary to discourage "unbalanced bids" by contractors:

"Such a bid, it is explained, is one in which the contractor allocates a disproportionate share of indirect costs and anticipated profit to the unit prices bid for those items on which he anticipates an overrun; the object being to reap overgenerous profits should the anticipated overruns materialize. While in the abstract this suggestion has considerable logical appeal, the difficulty with its application to the present controversy is that, in addition to the contradictory purport of the language employed in the governing regulation, there is not a shred of evidence in the record manifesting its involvement in any event. The burden of the argument is therefore more appropriately directed to those officials charged with responsibility for formulating procurement policy and effectuating it by adoption of appropriate contract language and regulations. *Should those officials conclude that neutralization of the vice of unbalanced bids can best be accomplished by the de novo repricing of excess or short-fall procurement under an estimated quantity contract, they can readily adopt language to that end.... To date, this has apparently not been done.*"

*Id.* (emphasis added).

Notwithstanding SHA's argument to the contrary, it appears clear to us that the language embodied in this decision of the Court of Claims fully supports appellant's position that the proper standard is not whether the actual arrow board unit cost for the adjustable units was less than the contract unit price for arrow boards, but whether the actual unit cost for those adjustable units was less than the actual unit cost for the base units and, if so, whether the difference was due solely to the excess unit days. Appellant urges that we follow that approach, not only because it is a correct one and has been followed by a number of Federal contract appeals boards but also because it was the definitive interpretation of the Federal clause at the time

Maryland adopted the State regulation and thus affords a compelling basis for concluding that the Maryland regulation was intended to be construed the same way.

SHA responds that *Victory* was wrongly decided and should not be followed. That decision, it says, fails to give proper recognition to the first sentence of the clause, which SHA believes is the critical provision. SHA conceives that, if it proves the requisite overrun, it is entitled to an equitable adjustment. Once it shows that entitlement, the contract unit price ceases to have real significance, and SHA's only obligation with respect to the adjustable (overrun) units is to pay the contractor his "costs" for those units, which it takes to mean actual cost plus reasonable profit. For the second sentence of the clause to permit that result, SHA conceded at oral argument, the "increase" provision would have to be construed as applicable only to overrun situations and the "decrease" provision would be limited to underruns. Thus, to support SHA's position, the second sentence would have to be read as though it said:

"The equitable adjustment shall be based upon any increase [or decrease] in costs due solely to the variation above one hundred twenty-five percent (125%) [or below seventy-five percent (75%)] of the estimated quantity *or any decrease in costs due solely to the variation below seventy-five percent (75%) of the estimated quantity.*"

(Brackets indicating deletions from actual clause, underscoring indicating additions.)

In support of its position, SHA cites principally a decision rendered by three administrative law judges, in separate opinions, on behalf of the Armed Services Board of Contract Appeals in *Bean Dredging Corp.*, 89–3 ENG B.C.A. (CCH) para. 22,034, p. 110,816, 1989 WL 81107 (1989) and the later Claims Court decision in *Burnett Const. Co. v. U.S.*, 26 Cl.Ct. 296 (1992).

*Bean* involved a dredging contract based on a unit price for an estimated amount to be dredged. In fact, the contractor was required to dredge considerably more than

115% of the amount estimated in the contract, and because the cost of dredging the excess material far exceeded the contract unit price, the contractor sought an equitable adjustment. The underlying facts were not in substantial dispute; the issue, as framed by ALJ Peacock, is what it is here: "with respect to what price is the actual unit cost of the adjustable quantity to be compared, *i.e.*, the contract unit price ... or the actual experienced unit cost of dredging 115% of the estimated quantity." *Id.* at 110,821.

ALJ Peacock acknowledged that, by law, the Board was bound by decisions of the U.S. Court of Claims, which would include the decision in *Victory*.[7] With the concurrence of his two colleagues, however, he distinguished *Victory* on its facts (and also suggested that the heart of that decision was *dicta*), and on that basis proceeded to act in complete derogation of the Court of Claims interpretation of the variations clause. The distinction, according to ALJ Peacock, was that, in *Victory*, there was no indication that the "actual unit costs for the nonadjustable [base] quantities differed materially from the contract unit prices." *Id.*

---

7. The Federal Courts Improvement Act of 1982 abolished the U.S. Court of Claims and created in its place what is now the U.S. Claims Court. The new court inherited substantially all of the jurisdiction of the former court and, to assure continuity, declared in its first General Order that all published decisions of the U.S. Court of Claims would be accepted as binding precedent for the U.S. Claims Court until modified by that court, the U.S. Court of Appeals for the Federal Circuit, or the U.S. Supreme Court. *See* 1 Cl.Ct. cliv. In this regard, J. Cibinic and R. Nash, *Administration of Government Contracts*, 2d ed. (1985) p. 15, inform us that prior to 1982, the Court of Claims "effectively served as the court of last resort in litigation of procurement matters." Further review could be obtained only through a petition for certiorari to the Supreme Court, which rarely granted such petitions in procurement matters. Under the current law, the Claims Court serves as a trial court, with one judge presiding, and further review is available by appeal to the U.S. Court of Appeals for the Federal Circuit. Administrative resolution of disputes with government procurement agencies is handled by the several boards of contract appeals, which are part of the contracting agencies. Appeals from those boards are also to the Court of Appeals for the Federal Circuit. The boards and the Claims Court thus appear to have parallel trial jurisdiction.

at 110,821. The *Victory* court, he said "implicitly assumed that the actual unit cost for the nonadjustable quantity was reflective of the contract price" and that "[t]herefore, the Court was not comparing actual unit costs of the adjustable vis-a-vis nonadjustable units in the irrelevant abstract." *Id.* at 110,822.[8] Having noted this alleged distinction, ALJ Peacock asserted that application of the principles set forth in *Victory* would produce absurd results in a case where the contract unit price differed substantially from the actual unit cost of either the adjustable or the base units. In short, he proceeded to restrict *Victory* to the circumstance he assumed was present in that case, namely, where the contract unit price fairly represented the actual unit cost.

The two concurring ALJ's also noted their fundamental disagreement with *Victory;* ALJ Sheridan indeed complained that it had caused "undesirable and unnecessary confusion in the handling of variations in estimated quantities under construction contracts." *Id.* at 110,824. In his view, the intent of the variations clause "is to bind the parties to the contract unit prices for all quantities within the plus-or-minus fifteen percent range, but to release the parties from the contract unit price, upon demand, for the portions of overruns that exceed 115 percent of the estimated quantities." *Id.* at 110,825. He did observe, however, with some consternation, that the government had failed to make any change in the clause in the 15 years since *Victory* had been decided. ALJ Solibakke found fault both with the pronouncements in *Victory* and with what he regarded as the "sloppily and ambiguously drawn language" of the clause itself. *Id.* at 110,827.

---

**8.** ALJ Peacock did not elaborate on this notion of an implicit assumption by the *Victory* court. It may have come from the Court's discussion of the contractor's affidavit that the Board had ignored. It may also have stemmed from the Government's concern about "unbalanced bids" leading to overgenerous profits, to which the Court responded, in part, that there was no evidence in the record demonstrating that to be the case.

In *Burnett Const. Co. v. U.S., supra,* 26 Cl.Ct. 296 (1992), Judge Horn, of the U.S. Claims Court, took essentially the same position on this issue as the administrative law judges in *Bean.* Although following *Victory* to the extent that it placed the burden on the proponent of the equitable adjustment to prove its entitlement to that adjustment (and to the amount sought), Judge Horn rejected the approach that the adjustment was to be measured by comparing the actual unit cost for the adjustable units with the actual unit cost for the base units. To do that, he said, would, as the *Bean* tribunal declared, produce absurd results if those costs varied significantly from the contract unit cost. If, for example, the actual unit cost for the adjustable units was less than the actual unit cost for the base units, the government would be entitled to a downward adjustment even if both actual unit costs exceeded the contract unit cost. On the other hand, if the actual unit cost of the adjustable units exceeded the actual unit cost of the base units, the contractor would be entitled to an increase even if both costs were less than the contract unit cost. Judge Horn concluded, at 307–08:

> "The Variations clause, which was developed in recognition of the fact that, in some types of work, it is impossible to arrive at reasonably accurate estimates of the quantities of some operations to be performed, provides that unit prices set forth in the contract are to apply to all quantities of work within the range specified in the clause, and that either party may demand repricing of work which falls outside of that range. In situations in which the Variations clause is activated, however, *normal principles of pricing equitable adjustments, such as are utilized under other standard government contract clauses, should apply.*"

(Emphasis added.)

*Bean* and *Burnett* have themselves been criticized. In *Foley Co. v. U.S.,* 26 Cl.Ct. 936 (1992), the government, like SHA here, was seeking a downward adjustment in the contract unit price for overrun adjustable units. Relying on

*Bean* and *Burnett,* the government contended that it was entitled to a complete repricing of the adjustable units to afford the contractor with no more than a price "that would provide actual costs plus a reasonable profit for the excess units." *Id.* at 941. Judge Turner declared that both of those cases were wrongly decided, and he returned to the *Victory* approach. The *Bean* approach, he said, "cannot be reconciled with the phrase 'increase or decrease in costs due solely to the variation'" and itself could lead to an absurd result when the variation is due to an underrun. *Id.* at 943, 944. Nor, he continued, could Judge Horn's decision in *Burnett* be squared with the language of the clause. Judge Turner concluded, at 944, that "the government is entitled to a downward adjustment only if it can show that [the contractor's] per unit cost for removing sludge in excess of the base units decreased *solely* as a result of such excess."

The Armed Services Board of Contract Appeals reached a similar conclusion in *Clement–Mtarri Companies, supra,* ASBCA No. 38170 (July 8, 1992). That case also involved an overrun where the government sought a downward equitable adjustment restricting the contractor to its actual reasonable costs plus a reasonable profit for the adjustable units. The Board rejected *Bean* and its reasoning, concluding that, if the government was concerned that the contract unit price was inflated, it had the power to terminate and renegotiate the contract under the "termination for convenience" clause, a clause that is also required in Maryland construction contracts. If it sought relief under the variations clause, however, it would, as the *Victory* Court declared, have to prove "why the amount paid should be less than that called for by the contract unit prices." In calculating any such adjustment, the Board continued, "[o]ne needs to look to cost economies attributable to excess volume and to deduct those economies from the unit price" and not "reprice the adjustable quantities based on their cost plus a reasonable profit."

We, of course, are not bound by any of these Federal decisions; they are simply guides.

The basic scheme implicit in the variations clause, when read in conjunction with the contract as a whole, is not difficult to discern. We may question the wisdom of it, and we see some difficulty in its application, but· the basic scheme, or process, seems clear.

■ We start with the contract unit price; that is the price to be paid, even for adjustable units, unless an equitable adjustment, *to that price*, is required. That basic premise, we think, is implicit from the contract language applicable to arrow boards (and other unit price items). See *ante:* "Method of Measurement and Basis of Payment shall be at the contract unit bid price per unit day." There is nothing in that language, or in any other, suggesting that there is to be a complete repricing or that the contract unit price is to be ignored for overrun (or underrun) units.

■ To become entitled to an equitable adjustment, a party must establish four things. The first thing he needs to show, of course, is the existence of adjustable units—the requisite overrun or underrun. That is evident from the first sentence of the clause. The second thing he needs to establish is that the actual unit cost of the adjustable units varies, in his favor, from the contract unit price, for, unless he can show such a difference, no adjustment in the contract unit price is warranted. If the actual unit cost for the adjustable units is the same as the contract unit price, any reduction in the contract price would not make the contractor "whole," which is the purpose of an equitable adjustment, and any increase in the contract unit price would give the contractor a windfall profit, which is *not* the purpose of the clause.

The third thing that the proponent needs to establish is that the actual unit cost of the adjustable units is greater or lesser, as the case may be, than the actual unit cost of the base units. That second comparison, between actual unit costs, is required because it serves as the basis for measur-

ing the amount of any adjustment. And finally, the proponent must demonstrate that this difference in actual unit cost is due solely to the overrun or underrun and not to any other cause.

If the proponent establishes these four things, under the clear language of the clause—both sentences read together—he would *ordinarily* be entitled to an adjustment *to the contract unit price* for the adjustable units in an amount equal to the difference in actual unit costs due solely to the variation. That difference would be added to, or deducted from, the contract unit price, as the case may be.

In construing the clause in this manner, we stress that this is its *ordinary* application. There is some flexibility, however, which also arises from the language of the clause. The clause speaks of an "equitable" adjustment that is to be "based on" an increase or decrease in "costs" due solely to the variation.

The word "costs" is not defined in the clause, and thus, when the evidence indicates that the contractor, in its bid, has shifted expenses from one item to another, it may indeed be inequitable to require the government, if it is the one seeking the adjustment, to be put to the burden of auditing the entire job to find and determine the relevance of camouflaged expenses. It may be, in that circumstance, that the government, in making its comparison of actual unit costs of the base and adjustable units, need look only at the *lesser* of those expenses properly allocable to the item for which an adjustment is sought or those actually included in it.

Apart from the determination of "costs," additional leeway is implicit from the "equitable" nature of the adjustment and the fact that it is merely to be "based on" and not necessarily equivalent to the cost differential. Keeping a contractor "whole" does not require that it be given an excessive profit based on its use of creative accounting in devising its item bid; nor does it allow the Board to cause injury to the contractor by refusing to compensate it for

unit costs legitimately incurred by reason of a significant change in the scope of the work upon which the contractor bid.

The standard, being an equitable one, needs to be flexible in its application. It is not to be applied so rigidly as both the Board and the court, in their very different ways, applied it. We shall therefore vacate the judgment below and remand the case to the circuit court for further remand to the Board of Contract Appeals so that the Board may reconsider the matter in light of this Opinion and not as directed by the circuit court.

JUDGMENT VACATED; CASE REMANDED TO CIR-CUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDING IN ACCORDANCE WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.